# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## CONCISE SUMMARY OF THE CASE

Pursuant to 3rd Cir. LAR 33.3, counsel are required to file a concise summary of the case within **14** days of the date of docketing of the Notice of Appeal. Total statement is limited to no more than 2 pages, single-spaced. Counsel may utilize this form or attach a 2 page statement encompassing the information required by this form.

SHORT CAPTION: Simkova v. City of Newark, et al.

USCA NO.: 14-2076

LOWER COURT or AGENCY and DOCKET NUMBER:

2:13-cv-01264

NAME OF JUDGE: The Honorable Katharine S. Hayden, U.S.D.J.

Specify who is suing whom, for what, and the subject of this action. Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court or agency from which this action is taken:

Ms. Zdenka Simkova is suing the City of Newark, the Newark Police Department, the City of Garfield, the Garfield Police Department, the New Jersey Office of the State Medical Examiner, and Eternity Funeral Services, LLC for deprivation of her due process rights pursuant to U.S.C. 1983.

1) This is an action based upon the deprivation of the appellant's due process rights under U.S.C. 1983.

2) The parties to this appeal are: the City of Newark; the Newark Police Department; the City of Garfield; the Garfield Police Department; the New Jersey Office of the State Medical Examiner; and Eternity Funeral Services, L.L.C.

3) The amount in controversy is an amount no less than $2,000,000.00

4) This appeal is taken from the USDC for the District of New Jersey's decision granting appellee's motion for dismissal on March 31, 2014.

LIST and **ATTACH** a copy of each order, judgment, decision or opinion which is involved in this appeal. If the order(s) or opinion(s) being appealed adopt, affirm, or otherwise refer to the report and recommendation of a magistrate judge or the decision of a bankruptcy judge, the report and recommendation or decision shall also be attached.

1. Order and Opinion granting Defendants' Motion to Dismiss, and sua sponte dismissing all claims against the remaining Defendants.

Provide a short statement of the factual and procedural background, which you consider important to this appeal:

- Appellant claims violation of Due Process in that she was deprived her property interest in the remains of her deceased son as a result of the actions of the Defendants.
- Appellant initiated the action in the U.S.D.C. for the District of New Jersey on March 1, 2013.
- On June 05, 2013, Appellee New Jersey Office of the State Medical Examiner filed a notice of appearance in the matter.
- On July 19, 2013, Appellees City of Newark/Newark Police Department and the City of Garfield/Garfield Police Department filed Motions to dismiss in lieu of an answer.  On August 05, Appellee New Jersey Office of the State Medical Examiner filed a Motion to dismiss in lieu of an answer.   Eternity Funeral Services, L.L.C. filed their Answer to Appellant's complaint on November 11, 2013, and did not submit a motion to dismiss.
- Appellant opposed all motions to dismiss, and on March 12, 2014, oral argument was held concerning the Motions to Dismiss.
- On March 31, 2014, Appellee's motion to dismiss was granted, and the Court sua sponte dismissed all claims against the remaining defendants.

Identify the issues to be raised on appeal:

When all factual allegations are taken as true, whether Appellant has stated a claim upon which relief may be granted, when all reasonable inferences are drawn in favor of the Appellant.

This is to certify that this Concise Summary of the Case was mailed to the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record this _12th_ day of _June_ ,20_14_ .

_____

Signature of Counsel

**United States District Court
for the District Of New Jersey**

ZDENKA SIMKOVA

           Plaintiff,

   v.

CITY OF NEWARK; NEWARK POLICE
DEPARTMENT; CITY OF GARFIELD;
GARFIELD POLICE DEPARTMENT; OFFICE
OF THE NEW JERSEY STATE MEDICAL
EXAMINER; ETERNITY FUNERAL
SERVICES, LLC; ZHONGXUE HUA, M.D.
Ph.D; MONICA CALDERON

          Defendants.

Civil No.: 13-1264 (KSH)

**Final Order**

    This matter having come before the Court on defendants' motions to dismiss [D.E. 10, 11, 16], and for the reasons set forth in the accompanying opinion [D.E. 50],

    **IT IS**, on this 31st day of March, 2014,

    **ORDERED** that the defendants' motions to dismiss [D.E. 10, 11, 16] are **GRANTED**; and it is further

    **ORDERED** that the federal claims against the remaining parties—individual defendants Hua, Calderon, and Eternity Funeral Services—are **DISMISSED** *sua sponte*; and it is further

    **ORDERED** that the Court declines to exercise supplemental jurisdiction over the state-law claims; and it is further

    **ORDERED** that the complaint [D.E. 1] is dismissed; and it is further

    **ORDERED** that the Clerk of the Court shall close the case.

                           /s/ Katharine S. Hayden
                           Katharine S. Hayden, U.S.D.J.

Not for Publication

**United States District Court**
**for the District Of New Jersey**

| | |
|---|---|
| ZDENKA SIMKOVA<br><br>                    Plaintiff,<br><br>     v.<br><br>CITY OF NEWARK; NEWARK POLICE<br>DEPARTMENT; CITY OF GARFIELD;<br>GARFIELD POLICE DEPARTMENT; OFFICE<br>OF THE NEW JERSEY STATE MEDICAL<br>EXAMINER; ETERNITY FUNERAL<br>SERVICES, LLC; ZHONGXUE HUA, M.D.<br>Ph.D; MONICA CALDERON<br><br>                    Defendants. | Civil No.: 13-1264 (KSH)<br><br><br><br><br><br>            **Opinion** |

**Katharine S. Hayden, U.S.D.J.**

In January 2012, plaintiff Zdenka Simkova ("Simkova") learned that her son, Michael

Simko ("Michael")—who went missing in 2007 over the Thanksgiving holidays and had never

been located—had died years earlier and was buried in a mass grave in Hackensack.  She filed a

federal lawsuit detailing both the resistance she faced after she reported him missing within days

after he failed to show up at her house and the misinformation she received from official sources.

Over four counts in her complaint [D.E. 1], three of which were based primarily on federal

constitutional claims, Simkova alleged that the defendants failed to follow proper procedures for

the identification and investigation of missing persons—a result, in part, of the municipal

defendants' policies and their failure to train their employees—thereby depriving her of her right

to possess her son's body and to bury him in accordance with her religion.

1

Presently before the Court are three motions to dismiss the complaint, filed by the City of Newark and its police department (hereinafter the "Newark defendants" or "Newark"), the City of Garfield and its police department (hereinafter the "Garfield defendants" or "Garfield"),[1] and the Office of the New Jersey State Medical Examiner. [D.E. 10, 11, 16.] The moving defendants argue that the complaint fails to state a valid federal constitutional claim and that certain of the defendants are immune from suit in federal court. The Court held oral argument on the motions. For the following reasons, they are granted, and the Court dismisses *sua sponte* the remaining, non-moving defendants.

## I. The Complaint

### A) Factual Background

Michael, then 27 years old and residing in Jamaica, Queens, was supposed to visit his mother in Garfield, New Jersey, over Thanksgiving 2007. He never arrived. (Compl. ¶¶ 16–18.) Simkova went to the 113th Precinct in Queens, New York, on or about November 22, and filed a missing persons report which included Michael's name, photograph, description, and that he had been last seen in Newark. (Compl. ¶¶ 20–21.)

Simkova went to the Garfield Police Department on November 26 to file another missing persons report. However, officers there refused to process the request, telling Simkova that she needed to file a report in New York City, which she had already done. (Compl. ¶¶ 19–21.)

Because Michael had last been seen in Newark, Simkova went to the Newark Police Department on December 1. Officers there informed her that they had seen Michael the previous day, when he had asked to stay overnight in the precinct. (Compl. ¶¶ 21–22.) Simkova returned

---

[1] The police departments and the municipalities are considered the same entity for the purposes of liability. *See Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n.4 (3d Cir. 1997).

to the precinct on December 9, where she was again told that Michael had been seen alive recently in the area. Both times, officers refused to process a missing persons report. (Compl. ¶¶ 21–23.) Simkova also attempted to post flyers around Newark Penn Station, but police officers whom she identifies as coming from Newark Police Department stopped her and again did not let her file a missing persons report. (Compl. ¶ 24.)

In fact, on November 23, Michael's body had been discovered at 34 Mercer Street in Newark. (Compl. ¶ 29.) He was identified by his fingerprints on November 27 by defendant Zhongxue Hua, a medical examiner, who determined that the cause of death was a mixture of heroin and alcohol. (Compl. ¶ 30; *see also* Autopsy Report [D.E. 14-2].) The complaint alleges that Hua did not notify Simkova or "the appropriate officials," and Michael's body laid unclaimed until it was turned over to defendant Eternity Funeral Services in August 2008. He was buried in a mass grave at Maple Grove Cemetery in Hackensack. (Compl. ¶¶ 31–32.)

In January 2012, the New York Police Department called Simkova and told her about Michael's death, instructing her to contact the local medical examiner's office. (Compl. ¶ 25.) Simkova went to the Northern Regional Medical Examiner's office and spoke with defendant Monica Calderon, an employee of the New Jersey State Medical Examiner. Through pictures that Calderon showed her, Simkova positively identified Michael. (Compl. ¶¶ 26–28.)

### B) Defendants and Grounds for Relief

The complaint was filed on March 1, 2013 against the Garfield and Newark defendants, the State Medical Examiner, Eternity Funeral Services (hereinafter "Eternity"), Hua, and Calderon, as well as several John Does and unnamed corporations. Hua and Calderon are sued in their official and individual capacities. (Compl. ¶¶ 5–15.)

3

Counts one and two of the complaint charge the Garfield and Newark defendants, the

Medical Examiner, and Eternity (but not the individual defendants) with failure-to-train/official-

policy-or-custom claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act,[2] premised

on the deprivation of Simkova's due process right to possess the body of her son.  (Compl.

¶¶ 48–59.)  Count three, also arising under § 1983, alleges First Amendment free exercise

violations by all of the defendants.  (Compl. ¶¶ 60–64.)  Count four is a New Jersey state-law

claim charging all defendants with violating New Jersey statutory and common law.  (Compl.

¶¶ 65–68.)  Simkova seeks compensatory damages, prejudgment interest, punitive damages,

costs, and fees.  (Compl. 12.)

The complaint references two New Jersey laws in the course of its allegations.  The first,

N.J.S.A. § 45:27-22, is entitled "Control of funeral, disposition of remains," and in pertinent part

sets out the order of persons to be notified in connection with the disposition of human remains

in the absence of instructions.  Simkova contends that this statute and New Jersey common law,

in addition to providing the basis for ground four of the complaint, give parents "a property right

. . . to control the funeral and disposition of the remains of a deceased child," which is "entitled

to due process protection and [is] actionable under 42 U.S.C. § 1983."  (Compl. ¶¶ 46–47.)  The

complaint also cites to two parts of "Patricia's Law," which went into effect in August 2008 and

altered certain New Jersey reporting and investigative procedures: N.J.S.A. § 52:17B-213, which

is the portion requiring the acceptance of missing persons reports; and § 52:17B-220, which

governs the conduct of medical examiners' offices, requiring among other things that they

coordinate with law enforcement when handling the remains of a missing person.

---

[2] As the complaint references the New Jersey Constitution, the Court will assume that plaintiff
intended to plead a New Jersey Civil Rights Act claim.

## II. Jurisdiction and Standard of Review

Except as indicated otherwise below, the Court exercises federal-question jurisdiction

over Simkova's federal constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343.  In

evaluating a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Court accepts all well-pleaded

allegations in the complaint as true and draws all reasonable inferences in Simkova's favor.  The

complaint survives dismissal under the now-familiar *Twombly/Iqbal*[3] standard if those

allegations and reasonable inferences show that she has a plausible claim for relief—a "context-

specific" analysis that also requires the Court to disregard legal conclusions masquerading as

facts.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).  Although the court

may consider "exhibits attached to the complaint, matters of public record, as well as

undisputedly authentic documents if the . . . claims are based on these documents," *Mayer v.

Belichick*, 605 F.3d 223, 230 (3d Cir. 2010), the complaint itself remains the focus of inquiry,

*Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994).

The parties attached to their papers exhibits relating to both the facts and procedural

underpinnings of the case.  For example, Simkova attached Hua's autopsy report to her

opposition to the City of Garfield defendants [*see* D.E. 14-2], and the Medical Examiner

submitted an affidavit attesting to Simkova's failure to file a Tort Claims notice [*see* D.E. 16-5].

At oral argument, the parties attempted to reconcile some of the facts contained in these

submissions with the allegations of the complaint, especially those pertaining to the chronology

of Simkova's efforts to file police reports, the issues surrounding the possession of Michael's

body, and the extent of the investigation into Michael's identity.  For example, counsel for the

Newark defendants used a copy of the New York City police report to show that it was filed after

---

[3] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U. S. 544 (2007).

Simkova's visit to the Garfield police, not before. As the Court said during oral argument, matters outside of the complaint would be considered to the extent that they did no violence to the dismissal standard or the Federal Rules in general. Additionally, it was generally agreed among counsel that the operative facts are not in dispute; rather, the issue is whether Simkova has mounted constitutional claims. Mindful of the motion to dismiss standard and that none of the parties seeks summary judgment, the Court will generally rely upon the allegations of the complaint.

### III. Discussion

#### A) Eleventh Amendment Immunity

The Medical Examiner contends that his office is entitled to the protection of Eleventh Amendment immunity, and thus cannot be sued in federal court. (Medical Examiner Moving Br. 4–6 [D.E. 16-4].) Under the Eleventh Amendment, and with exceptions not relevant in this case, "[s]tate governments and their subsidiary units are immune from suit in federal court." *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 551 F.3d 193, 195 (3d Cir. 2008).

The motion is captioned as brought under Fed. R. Civ. P. 12(b)(6), but an Eleventh Amendment defense, which is jurisdictional, is more properly brought under Fed. R. Civ. P. 12(b)(1). *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693 n.2 (3d Cir. 1996). When the jurisdictional challenge is a factual one, as here, the Court can reach outside of the complaint to address the documents submitted in support of (and in opposition to) the motion, *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977), and can draw inferences in the moving party's favor if the evidence so warrants, *S.R.P. v. United States*, 676 F.3d 329, 343 (3d Cir. 2012). The burden remains on the moving party to show that it is entitled to immunity. *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995).

At issue is whether the Medical Examiner falls into the broader category of "state governments and their subsidiary units." In order to answer this question, the Court looks to the "*Fitchik*" factors: (1) whether the payment of a judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has. *Fitchik v. N.J. Transit Rail Ops., Inc.*, 873 F.2d 655, 659–60 (3d Cir. 1989). All factors must be considered equally. *Bowers v. NCAA*, 475 F.3d 524, 546 (3d Cir. 2007).

The actual entity sued in the complaint is "the Office of the New Jersey State Medical Examiner." By statute, New Jersey law establishes this office in the Division of Criminal Justice in the state's Department of Law and Public Safety. N.J.S.A. § 52:17B-79. The Examiner himself/herself is a gubernatorial appointee, and the office has "general supervision over all county medical examiners," with the power to "promulgate such rules and regulations as he may deem necessary to effectuate the provisions of this act." N.J.S.A. § 52:17B-79 to 80. Supplies for the state office are furnished by the attorney general. N.J.S.A. § 52:17B-81. Employees of the broader Division of Criminal Justice, except for secretarial and clerical personnel, are in the "unclassified service of the civil service of the State." N.J.S.A. § 52:17B-100(b).

Based on this statutory scheme, it is clear that the main state Medical Examiner's office is an alter ego of the state as a subsidiary unit of the state itself. The Department of Law and Public Safety is an executive branch of the state government. *See* N.J.S.A. § 52:17B-1. The state budgets funds for the Department in its annual appropriations bills, which include the Medical Examiner's office under "direct state services." *See, e.g.*, 2009 N.J. P.L. ch. 68, 138, *available at* http://www.njleg.state.nj.us/2008/Bills/AL09/68_.PDF. In this District, the Department and its subdivisions have been found to be protected by the Eleventh Amendment. *See, e.g.*, *Druz v. Noto*, No. 09-5040, 2010 WL 2179550, at *4–5 (D.N.J. May 28, 2010)

(Wolfson, J.) (finding the Department to be immune), *aff'd*, 415 F. App'x 444 (3d Cir. 2011);

*Longoria v. New Jersey*, 168 F. Supp. 2d 308, 315–16 (D.N.J. 2001) (Orlofsky, J.) (finding that

the State Police, then organized under the Department, was an "arm of the state").  An

unpublished Appellate Division opinion has found that "the Medical Examiner's Office was not

subject to suit under § 1983, as it was a State department discharging its official duties regarding

the autopsy of decedent." *Newman v. Benitez*, No. A-6710-03T3, 2006 WL 1210684, at *20

(App. Div. May 4, 2006) (per curiam).  All of the *Fitchik* factors support a finding of Eleventh

Amendment immunity.

However, Hua was not an employee of the main Examiner's office, but was instead with

the Northern Regional office.  So Simkova argues that the *Fitchik* factors are not satisfied

because the regional offices are funded by and controlled by the counties they serve, with the

counties reimbursing the state for various costs.  (Simkova Medical Examiner Opp'n Br. 10–12

[D.E. 26].)  In making the argument, Simkova is referring to the county medical examiners

created under state law.  Although the main statutes laying out the duties of these county

examiners fall under the Law and Public Safety subchapter, the statutes elsewhere position

county examiners within the subchapter dedicated to municipal and county employees.  Unlike

the main state Examiner, the county examiners are appointed by county boards of chosen

freeholders, and their salaries, expenses, and facilities are provided for and maintained out of

county budgets.  N.J.S.A. §§ 40A:9-46, 52:17B-85.

While individual counties can run their own offices, they can also join inter-counter

cooperatives.  *See* N.J.S.A. § 52:17B-83.  The regional offices, Northern and Southern, are two

such cooperatives.  The parties agree that the Northern Regional office covers Essex, Hudson,

Passaic, and Somerset counties; Essex has no "county" office of its own.

Simkova's argument against state alter-ego status for the regional offices exposes a statutory gap: while New Jersey law allows for the inter-county cooperatives, the management and funding structure of the cooperatives is not defined. At issue is whether they resemble individual county offices, as Simkova urges, or are state-office subdivisions, as argued by the Medical Examiner.

Simkova relies principally on N.J.S.A. § 52:17B-83, which sets forth that "the treasurer of the county or counties, as the case may be, shall reimburse the Office of the State Medical Examiner or its designee for all costs incurred in properly conducting the county's death investigations and performing all other functions of the county medical examiner." (Simkova Medical Examiner Opp'n Br. 11.) That language refers, however, only to circumstances where counties fail to appoint medical examiners or the office becomes vacant, requiring the state to "take[] over the duties of a county medical examiner," and not to inter-county cooperatives. It is not applicable here.

In fact, the record evidence weighs strongly in favor of a state-subdivision finding. Attached to Simkova's opposition brief is a page from the Department's website that describes the organization and operation of the Southern Regional office, comprising Cape May and Cumberland counties. [D.E. 26-4.] According to the page:

> The counties entered into a contract with the Department of Law and Public Safety, whereby the Division of Criminal Justice provides death investigations, medical examiner services and toxicology analysis on a fee-for-service basis. The counties reimburse the state for the cost to operate the office.
>
> The staff at the Southern Regional Medical Examiner Office investigate the cause and manner of death in accordance with the NJ State Medical Examiner Act . . . . They conduct medico legal investigations, autopsies and other post-mortem analysis to provide county prosecutors and other law enforcement agencies with testimony, laboratory results and other necessary data and evidence . . . . The daily operation of the office . . . is under the direct supervision of a Medical Examiner, who reports to the State Medical Examiner.

9

Simkova interprets this language, and the funding structure from N.J.S.A. § 52:17B-85, to mean

that the Northern Regional office is "financially independent" from the state and is "controlled"

by the component counties. (Simkova Medical Examiner Opp'n Br. 11–12.) But a more

plausible reading is that the counties have created a financial cooperative, which otherwise cedes

control of the Regional office to the state; and, from the record, it is reasonable to infer that the

Northern Regional office is organized the same way as the Southern Regional office. This

inference is bolstered by 1) Assistant State Medical Examiner Roger Mitchell's certification that

he works for both Northern and Southern offices (*see* Mitchell Decl. ¶ 1 [D.E. 35-1]),[4] and 2) the

letterhead used by the Northern Regional office throughout the record, which reflects a position

within the larger State Medical Examiner's office. Thus, while the second *Fitchik* factor, status

under state law, may be ambiguous as applied here, the third, autonomy, weighs in favor of a

finding of Eleventh Amendment immunity.

That leaves the first *Fitchik* factor: how a money judgment would be paid. As the state

actually operates the Northern office pursuant to the inter-county cooperative, a suit against the

Northern Regional office would be functionally equivalent to a suit against the main Medical

Examiner's office and, thus, against the state itself. Simkova raises the question of

indemnification, but as the Supreme Court has held:

> it is the entity's potential legal liability, rather than its ability or inability to
> require a third party to reimburse it, or to discharge the liability in the first
> instance, that is relevant. . . . The Eleventh Amendment protects the State from
> the risk of adverse judgments even though the State may be indemnified by a third
> party.

*Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 431 (1997); *accord Benn v. First Judicial*

*Dist. of Pa.*, 426 F.3d 233, 240–41 (3d Cir. 2005) (holding that neither local funding nor

---

[4] At argument, Simkova objected to the Mitchell affidavit, characterizing it as a self-serving
document that was introduced via a reply brief. It is considered only to the extent set forth
above.

indemnification defeated Eleventh Amendment immunity). The reasonable inferences drawn from the record compel the conclusion that a suit against the Northern Regional office is equivalent to a suit against the state under the *Fitchik* test.

For the above reasons, the Court holds that the Medical Examiner is protected from suit by Eleventh Amendment immunity as an alter ego of the state; and to the extent that Simkova intended to sue the Northern Regional office, the office is equivalent to the main Medical Examiner. The Medical Examiner will be dismissed from this suit.

### B) Federal Due Process Claims under 42 U.S.C. § 1983

Counts one and two accuse the municipal defendants and non-movant Eternity of violating Simkova's due process rights. As lodged against the municipalities, these are commonly called *Monell* claims, after *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and can be based on (as here) an unconstitutional policy or custom or an unconstitutional failure to train. *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 274–76 (3d Cir. 2000). Municipalities cannot be held liable under theories of *respondeat superior*. *Mulholland v. Gov't Cnty. of Berks*, 706 F.3d 227, 237 (3d Cir. 2013).

Due process, the basis of each claim, protects against arbitrary government action, and has substantive and procedural components. *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 658 (3d Cir. 2011). "To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) [s]he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to h[er] did not provide due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006) (internal quotation marks & citation omitted). "The elements of a substantive due process claim are that: (i) defendants acted under color of

11

law; (ii) a protected property or liberty interest was at stake; (iii) the defendants had a duty of care toward the plaintiff; and (iv) a deprivation within the meaning of the due process clause occurred." *Roberts v. Mentzer*, 382 F. App'x 158, 166 (3d Cir. 2010) (nonprecedential) (interpreting *Fagan v. City of Vineland*, 22 F.3d 1296, 1310 (3d Cir. 1994)). "To establish a substantive due process violation by a municipality, a plaintiff must show that executive action was so ill-conceived or malicious that it shocks the conscience." *Mulholland*, 706 F.3d at 241 (internal quotation marks & citation omitted).

The parties dispute whether parents have an actionable property interest in the bodies of their deceased children. Simkova relies on decisions from outside the Third Circuit where parents have sued over the removal of corneas from the deceased. *See, e.g., Newman v. Sathyavaglswaran*, 287 F.3d 786, 796–97 (9th Cir. 2002) ("[W]e hold that the parents had property interests in the corneas of their deceased children protected by the Due Process Clause of the Fourteenth Amendment."); *Whaley v. Cnty. of Tuscola*, 58 F.3d 1111, 1116 (6th Cir. 1995). These decisions, however, may be limited in scope to corneal-tissue or other anatomical-gift contexts. *See Shelley v. Cnty. of San Joaquin*, 954 F. Supp. 2d 999, 1006–07 (E.D. Cal. 2013) (finding, in qualified immunity ruling, that *Newman* "did not clearly establish a broader property interest to the entire body," and that the Sixth Circuit decisions "have since been effectively overruled by the Michigan and Ohio supreme courts respectively on certified questions").

Because the question is unsettled in this Circuit, the Court will assume that the property interest exists for the purposes of addressing the merits and meeting the arguments made at oral argument, and will turn first to whether the complaint adequately states the other essential element of a due process claim: a deprivation. *See Mulholland*, 706 F.3d at 242 ("The initial

question in a section 1983 action is whether the plaintiff has alleged a deprivation of a

constitutional right at all." (internal quotation marks & citation omitted)).  And having examined

the complaint, the case law, and the issues raised by the parties during briefing and at argument,

the Court is constrained to find that Simkova fails to state a due process cause of action entitling

her to relief against the municipal defendants.  The events the complaint describes are disturbing

and painful, but in the specialized context of a constitution-based lawsuit, the settled law on the

rights of due process cannot support a cause of action based on what happened.

     As a preliminary issue, the complaint does not actually identify any unconstitutional

policy implemented by the municipalities that led to the actions of the individual officers in the

case.  At oral argument, counsel for Simkova made reference to inter-jurisdictional databases and

information sharing to suggest what Garfield and Newark should have done, but none of this

detail is in the complaint.  Instead, Simkova argues that the pending motions to dismiss should be

denied precisely so that she may gain access to handbooks and other materials that

"memorialize" the policies or training failures leading to the alleged constitutional deprivations.

(*See, e.g.*, Simkova Garfield Opp'n Br. 13–14.)  *See Fowler v. UPMC Shadyside*, 578 F.3d 203,

213 (3d Cir. 2009) (articulating the "reasonable expectation that discovery will reveal evidence"

standard).

     It is reasonable to infer that, in refusing to either accept missing-persons reports or allow

Simkova to post missing-person notices in Newark Penn Station, Garfield and Newark officers

were following some form of municipal or department policy.[5]  And at oral argument, Simkova's

---

[5] It is less clear how the one incident that distinguishes the Newark and Garfield fact patterns—
that Newark police misled Simkova about whether Michael was still alive, by reporting seeing
him near the precinct—can be fairly inferred as the product of municipal custom or failure to
train.  Since *Monell* liability cannot be predicated on *respondeat superior*, whether officers

lawyer told the Court that the purpose of raising Patricia's Law in the complaint was to show that standards existing *before* the implementation of Patricia's Law were inadequate.

"Inadequate," though, is not the same as "constitutionally deficient." If Garfield and Newark police-report policies were not in line with the desired policies of the state, such that the state felt the need to pass Patricia's Law, this has no bearing on whether the policies were so inadequate as to be constitutionally infirm. The declaration in Patricia's Law that henceforth no police department can refuse to take a missing persons report, *see* N.J.S.A. § 52:17B-213(a), can be seen as a bold, swift, and sure method of avoiding problems, particularly in the age of electronically stored information. It highlights how government may address unintended consequences such as happened here. At the same time, the policies of taking missing reports on a department by department basis are not revealed as *unconstitutional*, which is what Simkova needs for a due process claim. In fact, even if Garfield and Newark were to act the same way in 2014 as they acted in 2007, thereby violating the requirements of Patricia's Law, Simkova could not premise a § 1983 suit solely on the municipalities' failure to properly follow state law. *See McMullen v. Maple Shade Twp.*, 643 F.3d 96 (3d Cir. 2011) ("[B]y its terms, [42 U.S.C.] § 1983 provides a remedy for violations of federal, not state or local, law.").

Instead, to demonstrate constitutional infirmity requires "proof of a pattern of underlying constitutional violations," which is absent here. *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004). In *Bielevicz v. Dubinon*, 915 F.2d 845 (3d Cir. 1990), the Third Circuit emphasized that custom "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* at 850. Even if this Court stretched and assumed the existence of prior,

---

intentionally or mistakenly reported having seen Michael bears no relation to municipal liability under *Monell*.

inadequate policies, and accepted that they amounted to "custom," Simkova has not pleaded

facts showing how those policies plausibly led to what happened. "Claims not involving an

allegation that the municipal action itself violated federal law, or directed or authorized the

deprivation of federal rights, present much more difficult problems of proof." *Bd. of the Cnty.*

*Comm'rs v. Brown*, 520 U.S. 397, 406 (1997). "Like a tort plaintiff, a § 1983 plaintiff must

establish both causation in fact and proximate causation." *Lamont v. New Jersey*, 637 F.3d 177,

185 (3d Cir. 2011); *see also Barr v. Cnty. of Clarion*, 417 F. App'x 178, 181 (3d Cir. 2011)

(nonprecedential) (discussing the concept of proximate cause).

Keeping in mind the absolute requirement of showing a constitutional deprivation, while

it may be said that the municipal defendants' combined actions or inactions resulted in Michael's

burial years before his mother knew about his death, Simkova's due process claims must

demonstrate a direct causal link between a municipal policy or custom and the alleged

constitutional deprivation. *Carswell*, 381 F.3d at 244. Simkova's *Monell* claims rest on the

following chain of events: Newark and Garfield refuse to take police reports, Newark refuses to

let her leaflet, Michael's body remains unclaimed despite the identification, and he is buried

months later in a mass grave. Even construing the facts in the light most favorable to Simkova,

the link between policies in Newark and Garfield about how police reports on missing persons

were taken and the events alleged is simply "too tenuous" to support a claim of liability.

*Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990); *see also Hodinka v. Del. County*, 759 F.

Supp. 2d 603, 616 (E.D. Pa. 2010) ("This sort of attenuated causation logic would deprive

*Monell* of any significance as a bar to municipal liability.").

Simkova also has not pleaded facts sufficient to suggest a culpable mental state or level

of intent for either departmental individuals or the municipalities themselves. Negligence cannot

implicate a due process claim; only deliberate conduct will do. *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 191 (3d Cir. 2009). Showing the required state of mind in the context of *Monell* requires demonstrating that the municipal action was taken with "deliberate indifference as to its known or obvious consequences." *A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004) (internal quotation marks & citation omitted). Here, as argued by the defendants, the pleaded facts show, at best, heightened negligence: errors in taking and following up on missing persons reports. And as the Supreme Court pointed out in *Brown*, under the deliberate indifference test, "[a] showing of simple or even heightened negligence will not suffice." *Brown*, 520 U.S. at 407. Simkova cannot show a constitutional entitlement to a particular missing persons reporting system.

The defendants also rely on *Thompson v. Robert Wood Johnson University Hospital*, No. 09-00926, 2011 WL 2446602 (D.N.J. June 15, 2011), in which Judge Pisano decided that claims similar to the ones presented here did not survive summary judgment. In *Thompson*, the plaintiff told the defendants that she did not want them to perform an autopsy on her baby, but an autopsy was performed anyway. There was no indication in the record that the persons performing the autopsy knew about the plaintiff's objections. Suit was filed based on several theories, including due-process failure to supervise/train claims and deprivation of free exercise. *See Thompson*, 2011 WL 2446602, at *3. Judge Pisano found that there was no indication of willful conduct on behalf of the defendants; "[w]ithout evidence showing more than negligence . . .[,] the Court finds that no reasonable juror could find that [certain defendants] engaged in conduct sufficient to establish a violation of Plaintiffs' due process rights under § 1983." *Thompson*, 2011 WL 2446602, at *7. With regard to a failure-to-train claim, and assuming the underlying property interest discussed above, there was no evidence of a noxious policy sufficient to allow the

plaintiff to prevail on a *Monell* theory. *Id.* at *6. While decided under a different procedural posture, *Thompson* is similar enough to the case at bar to illustrate why Simkova has failed to state a claim upon which relief could be granted.

But the biggest impediment to Simkova's due process claims is that they seek to assign liability on the basis of the municipalities' *failure to assist* Simkova's search for her son. At its core, the constitutional deprivation she alleges is that the municipalities, using faulty policies, failed to act. Generally, "failures to act cannot form the basis of a valid § 1983 claim." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 433 n.11 (3d Cir. 2006). An exception to this rule, the "state-created danger" doctrine,[6] allows for failure-to-act liability when a plaintiff shows 1) foreseeable harm, 2) state action that shocks the conscience—it must *always* do so, *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006)—, 3) a state/plaintiff relationship creating foreseeable victimhood, and that 4) "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Ye v. United States*, 484 F.3d 634, 637–38 (3d Cir. 2007). This test no longer has a "third party" requirement in this Circuit. *Id.* at 637. The foreseeability showing in the context of the state-created danger doctrine is heightened; "[t]o adequately plead foreseeability . . . require[s] a plaintiff to allege an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 238 (3d Cir. 2008).

Simkova's due process claims fail the first and third prongs of the test. As discussed above, the link between the alleged policy, practice, or failure to train, and the harm resulting—

---

[6] Another exception, the "special relationship" test, requires a level of physical custody that is not present in this case. *See Ye v. United States*, 484 F.3d 634, 637 & n.1 (3d Cir. 2007) (construing Supreme Court case to require "a test of physical custody").

deprivation of her possession of Michael's body—is strained even under general principles of causation, and cannot meet the heightened standard required for a state-created danger theory of relief. Nor is there a particular relationship that speaks to foreseeable victimhood.

A case from the Sixth Circuit that the defendants rely on is instructive on this point. In *Gazette v. City of Pontiac*, 41 F.3d 1061 (6th Cir. 1994), the plaintiff's mother had been abducted. The plaintiff called the police department to report her missing. The police, knowing the mother to be an alcoholic, refused to take a report and lied about having investigated the scene. Later, the mother was found dead. The Sixth Circuit held that the underlying claim—that the officers did not rescue the mother—did not give rise to a constitutional tort under § 1983. *See id.* at 1065. The court then turned to the plaintiff's claims based on active misrepresentation: because the police officers had told her they were investigating, nobody else did so. This claim failed on causality, because there "is no close causal connection between the police officers' lies and [the mother's] death because many factors could have prevented the police officers, or [the mother's] family and friends, from locating [her]." *Id.* at 1066. Because "the Due Process clause does not guarantee any citizen the right to government aid, including a guarantee of rescue," this claim failed. *Id.* Finally, the police officers were at most grossly negligent, which the Sixth Circuit held to be insufficient *scienter* under *Collins v. City of Harker Heights*, 503 U.S. 115 (1992). *Id.* at 1066–67.

*Gazette* is not on all fours with Simkova's claims, but the differences hurt her case rather than help it. Under *Gazette*, if the police conduct had led to Michael's death—if, by refusing to take a missing-persons report, refusing to let Simkova leaflet, and actually lying to her about seeing him alive, the officers exacerbated the situation such that Michael died—neither the police nor the municipality would be liable under the state-created danger test. *Gazette* stands

18

for the proposition that *more* egregious conduct than Simkova has alleged would not amount to constitutional liability. Further, the outcome of *Gazette* is in line with the law of the Circuit, which pairs constitutional liability with affirmative state action. *See Bright v. Westmoreland Cnty.*, 443 F.3d 276, 284 (3d Cir. 2006) ("Liability requires affirmative state action . . . ."); *see also Lombardi v. Whitman*, 485 F.3d 73, 80 n.4 (2d Cir. 2007) (construing the principle of *Bright* to be a rejection of "the argument that a citizen's reliance on an officer's promises could constitute a state created danger").

Simkova argues that the state-created danger test is inapposite because she bases her claims not on the underlying failure to act, but rather on the policies or faulty training that led to the failure to act, which amount to affirmative municipal actions. On the facts of this case and the well-established law discussed above, this is a distinction without a difference. Courts have repeatedly held that, barring satisfaction of the state-created danger doctrine, a plaintiff cannot state a constitutional claim for failure to act. A plaintiff cannot evade these requirements by simply reframing a failure to act as an affirmative decision by the municipality, because municipal liability requires constitutional harm, *see Grazier v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003). The *Gazette* court came to essentially this conclusion, finding no underlying violation by the individual defendants and declining to reach the municipality's liability. *Gazette*, 41 F.3d at 1068.

Finally, and as an example of the usefulness of oral argument, counsel for the Garfield defendants read aloud language from the Supreme Court's decision in *City of Canton v. Harris*, 489 U.S. 378 (1989), in which the Supreme Court explained why—in the context of failure-to-train *Monell* claims—the heightened "deliberate indifference" standard of fault and causation was necessary:

19

> In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. . . . Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell* . . . . It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism.

*Id.* at 392 (citations omitted). Simkova's due process claims, which target the municipalities and not individual employees, are based on what Garfield and Newark "could have done" to allow her to recover the body of her son: they could have been (and later were, via Patricia's Law) looped into better missing-persons procedures, or been more sympathetic to her desire to leaflet in Penn Station, or been more aggressive at seeking information from the Medical Examiner. Even were a clearer deprivation identifiable, it might still not suffice under *Canton* because the essence of the factfinder's activity would be second-guessing the wisdom behind municipal action, as opposed to basing its decision on abhorrence of the outcome. And in the absence of a clear causal deprivation of a right, whether constitutional or not, these allegations do not rise to the level of stating constitutional violations by the municipal defendants.

In sum, the Court is satisfied, after examining them from all angles, that Simkova's federal constitutional claims in counts one and two of the complaint must be dismissed.

### C) Free Exercise Claim under 42 U.S.C. § 1983

Count three alleges that all defendants violated Simkova's First Amendment right to bury her son in accordance with her religious beliefs, in violation of the free exercise clause. This claim fails for substantially the same reasons—causality, foreseeability, and so on—discussed above. But in addition, it is well established that laws or actions that do not target religious practice, but instead incidentally burden that practice, need not be justified by a compelling

government interest. *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531

(1993). Simkova cannot show that either the policies or individual activities challenged here

"selectively burden religiously motivated conduct." *Brown v. City of Pittsburgh*, 586 F.3d 263,

284 (3d Cir. 2009). In fact, she does not allege that the defendants were aware of, or acted in

response to, her religious concerns, or had any idea that their actions might affect her religious

practice. "[N]egligent acts by officials causing unintended denials of religious rights do not

violate the Free Exercise Clause . . .[; a plaintiff] must assert conscious or intentional

interference with his free exercise rights to state a valid claim under § 1983." *Lovelace v. Lee*,

472 F.3d 174, 201 (4th Cir. 2006); *see also Thompson*, 2011 WL 2446602, at *8 ("[W]ithout

evidence showing some motivation relating to [the plaintiff's] religion, the Court finds that [the

defendants] could not have engaged in conduct sufficient to establish a violation of her free

exercise clause rights."). In the absence of these allegations, or of a showing of compulsion or

coercion, Simkova's free exercise claim cannot survive a motion to dismiss. *See Anspach v. City

of Phila.*, 503 F.3d 256, 272–73 (3d Cir. 2007) (deciding, in absence of compulsion, coercion, or

the defendants' awareness, that a plaintiff's free exercise rights were not violated).

### D) Hua and Calderon, the Non-moving, Individual Defendants

A trial court may dismiss a complaint *sua sponte* under Fed. R. Civ. P. 12(b)(6) if the

pleadings evince a proper basis to do so, and so long as the affected parties are provided proper

notice and an opportunity to respond. *See Coulter v. Unknown Prob. Officer*, No. 13-3607, 2014

WL 998537, at *2 n.2 (3d Cir. Mar. 17, 2014) (nonprecedential per curiam) (affirming *sua

sponte* dismissal of non-moving defendants based on grounds raised by one defendant "but

common to all defendants, and to which [the plaintiff] had an opportunity to respond");

*Martinez-Rivera v. Ramos*, 498 F.3d 3, 7 (1st Cir. 2007) (allowing for *sua sponte* dismissals in

limited situations); *cf. Otis Elevator Co. v. George Wash. Hotel Corp.*, 27 F.3d 903, 910 (3d Cir. 1994) (applying the same test in the summary judgment context). Notice requires giving a party reason to believe that the court might reach the issue, so that it can put "its best foot forward." *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 223 (3d Cir. 2004) (internal quotation marks & citation omitted).

Neither Hua nor Calderon has made an appearance in this suit. Counsel for Simkova said at argument—and the docket currently reflects—that while Calderon was served [D.E. 48], Hua has not been. Nevertheless, the Court finds that the claims against Hua and Calderon should be dismissed for precisely the same reasons discussed above, and on the exact theories to which Simkova responded both during briefing and at argument.

First, to the extent that Hua and Calderon are sued in their official capacities, "[a] suit against a governmental official in his or her official capacity is treated as a suit against the governmental entity itself." *A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004). Because Hua and Calderon are employees of the Medical Examiner, and the Medical Examiner (in both State and Regional forms) is protected by Eleventh Amendment immunity, then the official-capacity claims must also be barred under the Eleventh Amendment. *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 (3d Cir. 2010) ("Individual state employees sued in their official capacity are also entitled to Eleventh Amendment immunity . . . .").

Second, the only count naming Hua and Calderon as individual defendants to a federal claim is count three, the free exercise claim. As discussed above, free exercise claims rely on knowledge, compulsion, and coercion. Simkova alleges nothing of the sort with regard to either Hua and Calderon; in fact, Calderon's only involvement in this dispute is her interaction with Simkova at the Northern Regional office during the positive identification of Michael from a

22

photograph.  Accordingly, the claims against Hua and Calderon in their individual capacities must fail.

### E) Eternity Funeral Services

The same reasoning applies to compel the dismissal of Eternity, which has answered the complaint [D.E. 33] but did not move to dismiss.  Assuming without deciding that Eternity is a state actor such that § 1983 liability can apply, and that Simkova's *Monell* theory can also apply against Eternity (per grounds one and two), the free exercise and due process claims fail for the same reasons already discussed above.

### F) State-Law Claims

Simkova's state constitutional claims (in counts one and two) and statutory/common-law claims (in count four) remain.  As the Court has already dismissed all claims over which it could exercise federal question jurisdiction, the Court declines to exercise jurisdiction over the state-law claims and dismisses them without prejudice.  *See* 28 U.S.C. § 1367(c)(3); *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000).

### IV. Conclusion

Simkova's federal claims are dismissed in full under Fed. R. Civ. P. 12(b)(6) and the Court declines to exercise jurisdiction over the state law claims.  An appropriate order will be entered.

March 31, 2014

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.