IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 14-2076

_____

ZDENKA SIMKOVA
Plaintiff/Appellant

v.

CITY OF NEWARK,
NEWARK POLICE DEPARTMENT,
CITY OF GARFIELD, GARFIELD POLICE
DEPARTMENT, OFFICE OF THE NEW
JERSEY STATE MEDICAL EXAMINER,
ETERNITY FUNERAL SERVICES, L.L.C,
ZHONGXUE HUA, M.D. Ph.D.(Individually
and in his official capacity), MONICA
CALDERONE (Individually and in her official
capacity),
Defendants/Appellees
_____

On Appeal from the United States District Court
for the District of New Jersey, Newark Vicinage
Civil Action No. 2:13-CV-01264
(Honorable Katharine S. Hayden, District Judge)
_____

BRIEF FOR APPELLANT

_____

Peter E. Briskin
FISHBEYN & BRISKIN, L.L.C
17 Academy Street,  Suite 1200
Newark, New Jersey 07102
(908) 279-7979

Counsel for Appellant

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS…………………………………………………………………………i

TABLE OF AUTHORITIES……………………………………………………………………..ii

I.      INTRODUCTORY STATEMENT……………………………………………………….1

II.     STATEMENT OF SUBJECT MATTER AND APPELLATE
        JURISDICTION………………………………………………………………………….2

III.    ISSUE ON APPEAL……………………………………………………………………2

IV.     STATEMENT OF THE CASE…………………………………………………………4

V.      STATEMENT OF FACTS……………………………………………………………...5

VI.     STATEMENT OF RELATED CASES AND PROCEEDINGS…………………………9

VII.    SUMMARY OF THE ARGUMENT…………………………………………………..9

VIII.   ARGUMENT…………………………………………………………………………10

        A.      **THE APPELLANT HAS A RECOGNIZED PROPERTY
                RIGHT IN THE REMAINS OF HER
                SON…………………………………………………………………………..12**

        B.      **BY FAILING TO TRAIN OR SUPERVISE THEIR
                OFFICERS AND THROUGH THE MAINTENANCE
                OF OFFICIAL CUSTOMS AND POLICIES, THE
                APPELLEES HAVE DEPRIVED THE APPELLANT
                OF HER CONSTITUTIONALLY PROTECTED RIGHTS………………13**

        C.      **IT IS CLEAR FROM THE LANGUAGE OF
                N.J.S.A. § 45:27-22 THAT THE LEGISLATURE
                INTENDED TO CREATE A PRIVATE
                CAUSE OF ACTION FOR A VIOLATION
                OF THE STATUTE…………………………………………………………..18**

        D.      **THE APPELLEES HAVE VIOLATED THE PLAINTIFF'S FIRST
                AMENDMENT RIGHTS BECAUSE THEY HAVE SUBSTANTIALLY
                AND TOTALLY BURDENED THE PLAINTIFF'S RIGHT TO BURY HER
                SON IN ACCORDANCE WITH HER RELIGION…………………………19**

IX.     Conclusion……………………………………………………………………………20

## TABLE OF AUTHORITIES

### Cases

*Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000)..............................................................2.

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)..........................................................................2,3

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).......................................................2,3

*Board of Regents v. Roth*, 408 U.S. 564 (1972)....................................................................12

*Boring v. Google Inc.*, 362 Fed. Appx. 273 (3d Cir. Pa. 2010).........................................2,3

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).......................................... …13,14

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009)................................................ 3

*Gazette v. City of Pontiac*, 41 F.3d 1061 (6th Cir. 1994)...................................................10

*Gross v. German Found. Indus. Initiative*, 549 F.3d 605 (3d Cir. 2008)........................ 3

*Lascurain v. City of Newark*, 349 N.J. Super. 251 (App. Div. 2002)................................12

*Lee v. Wiesman*, 505 U.S. 577 (1992)................................................................................ 19

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978)........................ 13

*Monroe v. Pape*, 365 U.S. 167 (1961)............................................................................... 11

*Newman v. L Sathyavaglswaranm M.D.*, 287 F.3d 786, 789 (9th Cir. 2002)...............11

*Papasan v. Allain*, 478 U.S. 265, 286 (1886)..................................................................... 3

*Phillips v. County of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008)........................... 2,3

*Polk County v. Dodson*, 454 U.S. 312, 326 (1981)............................................................ 13

*Spiegel v. Evergreen  Cemetery Co.*, 117 N.J.L 90, 93 (Sup. Ct. 1936)..................................... 12

*Strachan v. John F. Kennedy Mem. Hosp.*, 109 N.J. 523 (1988)......................................12

*Thompson v. Robert Wood Johnson Univ. Hosp.*, 2011 U.S. Dist. LEXIS 63980 (D.N.J 2011)............... 12

*United States v. Lee*, 455 U.S. 252 (1982)...........................................................................19

### Statutes

28 U.S.C. § 1343…………………………………………………………………………… 2

28 U.S.C. § 1367…………………………………………………………………………… 2

28 U.S.C. § 1291…………………………………………………………………………… 2

28 U.S.C. § 1331…………………………………………………………………………… 2

42 U.S.C. § 1983…………………………………………………………………………… 3

N.J. Rev. Stat. § 52:17B-213 (2013)........................................................................................ 16

N.J.S.A. § 45:27-22……………………………………………………………………… 9, 12, 18, 19

U.S. Const. Amend. XIV.　Title 42 U.S.C.A……………………………………………… 1, 10

**Rules**

FED. R. CIV. P. 8(a)(2).......................................................................................................... 2

I.    **INTRODUCTORY STATEMENT**

In the State of New Jersey, a natural parent maintains a well-recognized property interest the remains of their child.  The Due Process Clause of the Fourteenth Amendment provides that, "[n]o State shall…deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV.  Title 42 U.S.C.A.   This case presents a tragic example of the damage that can be done when government agencies fail to appropriately train their employees or fail to maintain any policies or procedures for the handling of missing persons.  Zdenka Simkova's son, Michael Simko, died from a heroin overdose less than 15 miles from his Mother's home on Thanksgiving.  For the next four years, she existed in a state of limbo, not knowing whether her son was dead or alive, until finally it was revealed that her son had been recovered by a municipal agency (the Newark Police) who had informed the New York Police Department and Ms. Simkova herself, that they did not have her son's body.  However not only had the Newark Police discovered his body, but Ms. Simkova discovered that Michael's remains were sent to the Medical Examiner's office where his body remained for eight (8) months, until finally his remains were turned over to Eternity Funeral Services, LLC, where his remains were placed in a pine box and buried in a grave between two other bodies at Maple Grove Park Cemetery, in Hackensack, New Jersey   These actions deprived her of the opportunity to bury her son in accordance with her and her son's beliefs, and to memorialize his passing with some form of dignity.   The actions undertaken by the Appellees in this case far exceed that of "common negligence."  Instead they constitute deliberate indifference not only to Ms. Simkova's (hereinafter "Simkova") property interest in the burial of her son, but to returning the remains of what was likely perceived as a "heroin addict" to his next of kin.  This case touches upon a tenet

of civilized society, the sanctity of burial, and whether a municipality or other group can make the determination on who is worth the effort to return to their loved ones, and who is not.

## II.     STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The district court possessed subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.  The district court entered its final order dismissing Simkova's action on March 31, 2014.  *See* App. Vol. I. 000004. Simkova filed a timely notice of appeal on April 29, 2014. *See* App. Vol. I. 000001.

## III.    ISSUE ON APPEAL

Whether the Mother of a deceased son, whose remains were in the custody of a municipality who transferred custody of the remains to a state entity who then transferred the remains to the custody of a funeral home which ultimately authorized the interment of the remains in violation of State law, may assert a cause of action against all or some of the defendants where she was deprived her property interest in the interment and burial of her son's remains when she was not notified of her son's death for more than four (4) years and was never contacted by the municipality which discovered her son's remains, under 42 U.S.C. § 1983; and whether the deprivation of the ability to bury her son's remains constitutes a violation of her right to exercise her religion under the 1st Amendment.

**Standard of review:** This Court exercises plenary review over whether a district court has properly granted dismissal for failure to state a claim on which relief can be granted.  *See* Allah v. Seiverling, 229 F.3d 220, 223 (3d Cir. 2000).  In reviewing the legal sufficiency of Simkova's complaint, this Court shall accept as true the complaint's factual averments and all reasonable inferences in Simkova's favor that can be drawn from those averments.  *See*

2

Seiverling, 229 F. 3d at 223; *see also* Phillips v. County of Allegheny, 515 F.3d 224, 230 (3d

Cir. 2008).  The Federal Rules of Civil Procedure require that a complaint contain "a short and

plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P.

8(a)(2).  The complaint must set forth facts that raise a "plausible inference" that the defendant

inflicted a legally cognizable harm upon the plaintiff in order to avoid dismissal.  Ashcroft v.

Iqbal, 129 S. Ct. 1937,1952 (2009); *see also* Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556

(2007) (explaining that a plaintiff must "identify[] facts that are suggestive enough to render

[hisclaim] plausible"); Phillips, 515 F.3d at 234 (stating that "a plaintiff must 'nudge [his other]

claims across the line from conceivable to plausible' in order to survive a motion to dismiss")

(citations omitted); Boring v. Google Inc., 362 Fed. Appx. 273 (3d Cir. Pa. 2010).  Conclusory

allegations of liability do not suffice. *See* Iqbal, 129 S. Ct. at 1950 (opining that the federal

pleading standard "marks a notable and generous departure from the hyper-technical, code-

pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed

with nothing more than conclusions"); Boring, 362 Fed. Appx. 273.  A court confronted with a

Rule 12(b)(6) motion must accept the truth of all factual allegations in the complaint and must

draw all reasonable inferences in favor of the non-movant. Gross v. German Found. Indus.

Initiative, 549 F.3d 605, 610 (3d Cir. 2008); Boring, 362 Fed. Appx. 273.  Legal conclusions

receive no such deference, and the court is "not bound to accept as true a legal conclusion

couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1886) (cited with

approval in Twombly, 550 U.S. at 555 (citations omitted); Boring, 362 Fed. Appx. 273.

Although a plaintiff may use legal conclusions to provide the structure for the complaint, the

pleading's factual content must independently "permit the court to infer more than the mere

possibility of misconduct." Iqbal, 129 S. Ct. at 1950; Boring, 362 Fed. Appx. 273.  In short,

when the well pleaded complaint does not permit us "to infer more than the mere possibility of

misconduct," the pleader is not entitled to relief. <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 211

(3d Cir. 2009) (quoting <u>Iqbal</u>, 129 S.Ct. at 1949); <u>Boring</u>, 362 Fed. Appx. 273.


**IV.    STATEMENT OF THE CASE**

On March 1, 2013 Appellant Zdenka Simkova filed a Complaint with the United States

District Court for the District of New Jersey. *See* App. Vol. I. 000032.  Summons were issued to

the Defendants City of Newark and Newark Police Department (hereinafter "Newark"), City of

Garfield, Garfield Police Department (hereinafter "Garfield"), Office of the New Jersey State

Medical Examiner (hereinafter "Medical Examiner"), and Eternity Funeral Services, L.L.C.

(hereinafter "EFS"), on March 11, 2013.  *See* App. Vol. I. 000030-31.  On June 27, 2013,

Newark filed a Motion to Dismiss in Lieu of an Answer. *See* App. Vol. I. 000046.  Shortly

thereafter, Garfield and the Medical Examiner filed motions to dismiss on July 9, 2013 and

August 05, 2013 respectively.  *See* App. Vol. I. 000122 and 000214.   Appellant filed

Oppositions to Appellees Motions, and on August 16th, Newark filed a Reply Brief to

Appellant/Plaintiff's Opposition which included the Police Report and Incident Summary

regarding the Newark Police's discovery of Michael Simko.  *See* App. Vol. I. 000074

(Plaintiff/Appellant's Opposition with attached Exhibits to Newark's Motion to Dismiss); App.

Vol. I. 000170 (Plaintiff/Appellant's Opposition with attached Exhibits to Garfield's Motion to

Dismiss); App. Vol. I. 000233 (Plaintiff/Appellant's Opposition with attached Exhibits to

Medical Examiner's Motion to Dismiss).

Pursuant to the Court's Pretrial Scheduling Order dated September 6, 2013, all fact

discovery was to remain open until April 16, 2014, during the pendency of all parties Motions to

Dismiss.   Accordingly, discovery demands were exchanged.  While the Appellant provided answers to the discovery demands that they received, it must be noted that all parties did not provide responses, most notably Newark.  On November 27, 2013, Newark filed another Reply Brief to Appellant/Plaintiff's Opposition to their Motion to Dismiss, and included new evidence (the Investigative Report) which showed that Newark did in fact identify Michael Simko and did so shortly after discovering his body.  *See* App. Vol. I. 000477.  In the interim from the time of the defendants' filing of their motions and all the way up until shortly after oral argument, Appellant obtained additional evidence supporting her claim.

Oral argument for the Motion to Dismiss was held on March 12, 2014, and the Court granted Defendants' Motion for Dismissal and dismissed the Plaintiff's claims against the non-moving parties *sua sponte*.

## V.    STATEMENT OF FACTS

On November 22, 2007 Michael Simko, departed from his residence in Queens, New York, by train to visit his mother, Ms. Zdenka Simkova in Garfield, New Jersey, with a friend whom he eventually separated from and arrived in Newark, New Jersey.  *See* App. Vol. I. 000318.   At some point that night, he reached the alleyway where he would succumb to a heroin overdose.  *See* App. Vol. I. 000366.

On November 23, 2007, the Newark Police responded to several calls regarding a dead body in the alleyway behind Perry's Funeral Home, at 34 Mercer Street, Newark, New Jersey. *See* App. Vol. I. 000366.  The Police Report specifically references a call from Mr. Kenneth Montgomery, who initially discovered Michael's body App. *See* App. Vol. I. 000366.  The Newark Police were the first to arrive on the scene, followed by EMT's who failed to resuscitate Michael, and shortly thereafter, Investigator Gene Uricoli of the Northern Regional Medical

Examiner's Office.  *Id.*  Following a brief examination of the scene, Michael's body was taken

by the Northern Regional Medical Examiner's Office in order to determine the cause of death.

*Id*.  At that point, Newark began their "investigation" into Michael's identity.  The Newark

Police retrieved copies of Michael's Inked Fingerprint Impressions, and faxed them to the New

Jersey State Police, who found no match for the prints after conducting a statewide search.

Subsequently, the prints were "launched through I-AFIS," and this resulted in a match with

records kept in Virginia Beach, VA on Michael Simko relating to a previous arrest.  *Id.*  The

Newark Police investigative report states that as early as November 24, 2007, Newark was aware

of the identity of Michael Simko.  Contrary to the District Court's Opinion which states Michael

was "identified by defendant Zhongxue Hua," Michael was identified at the behest and efforts of

the Newark Police.  *Id*.  The extent of their investigation into his identity is summed up in a

paragraph.  A call was made to the Virginia Beach Police, who subsequently checked the address

associated with Michael's name.  Once they informed Newark that not only were there no family

present at the address provided, that it was not even an apartment, the Newark police requested

an article be placed in the Star Ledger on or about November 24, 2007 to assist with locating

next of kin.  *Id*.  Following this request, the case was closed, and no other efforts were made to

identify, locate, or notify Michael's next of kin.  It is clear from that fax that as far as the

Regional Medical Examiner's office was concerned, the Newark Police were understood to be

responsible for the investigation concerning Michael Simko's next of kin, as evidenced by the

facsimile message sent by Ms. Monica Calderon (a compliance officer employed by the Medical

Examiner's Office) to the Newark Police.  App. Vol. I. 000378.  The fax message referred to

from Monica Calderon to Newark Police notifying them that Michael's body was to be

recommended for burial, requested that the Newark Police advise if they needed additional time to locate and notify next of kin.

It is already established that the Newark Police knew about Michael Simko's identity as early as November 24, 2007. Ms. Simkova and her husband, Jan Magura, went to their local Garfield Police Department on November 25, who refused to take a missing person's report and instead directed them to the New York Police Department (NYPD), where a missing persons report was filed by Angela Johnson (believed to be Michael's girlfriend), on November 29, 2007. *See* App. Vol. I. 000318. On the date that the missing persons report was filed, NYPD Detective Edward St. John contacted the Newark Police and spoke with "P.O. Smitty (#154)." *See* App. Vol. I. 000318. Detective St. John relayed identifying information about Michael Simko to the officer, who informed Detective St. John that there was no record (either arrest, or unidentified person) matching Michael Simko. *See* App. Vol. I. 000318. P.O. Smitty then gave Detective St. John the number to two local hospitals that she stated Michael would have been brought to if he was found with no identification, omitting any information about the Office of the Northern Regional Medical Examiner. *See* App. Vol. I. 000318.

Detective St. John continued his investigation by interviewing Ms. Simkova, Bartek Haftowski (believed to be Michael's friend), and Angela Johnson. *See* App. Vol. I. 000318. While Detective St. John's investigation continued, Michael's body was stored at the Office of the Northern Regional Medical Examiner, referred to as the "Essex County Medical Examiner's Office" on the Newark Police Investigative Report. *See* App. Vol. I. 000366 and 000379.

On or about June 17, 2008, Monica Calderon contacted the Newark Police to notify them that Michael's body would soon thereafter be recommended for burial, and to advise her if they needed additional time to locate and notify next of kin. App. Vol. I. 000378. It is apparent from

Monica Calderon's fax message and the Office of the New Jersey State Medical Examiner's Policy and Procedure book (which states that the Office must refer the indigent individual's case to the appropriate agency for further investigation into investigation and eventually burial arrangements) that the Newark Police were required to undergo some type of investigation to identify, locate and notify Michael Simko's next of kin.  Not only did they do next to nothing to identify, locate and notify Michael Simko's next of kin, they actively impeded any attempts at notifying Ms. Simkova of her son's death by providing erroneous information to multiple parties on multiple occasions.  App. Vol. I. 000378., 000366, and 000379.  While it is certain that Newark did not locate and notify Michael's next of kin, we do not know how they responded to Ms. Calderon's fax because Newark never provided any responses to Appellant/Plaintiff's Discovery Demands and they have represented that they "lost the file" that was created for Michael, if one ever existed.

On August 04, 2008 Michael's body was released by the County of Essex to EFS for interment.  *See* App. Vol. I. 000395.  That same day at 3:00 PM, Michael's body was buried at Maple Grove Park Cemetery.  *See* App. Vol. I. 000397.  According to Mr. Aree Booker, the principal for EFS, EFS inters indigent bodies pursuant to a contract with the county of Essex.  *See* App. Vol. I. 000399.  EFS "works for" Essex County, and inters the bodies of any indigent persons at their request.  *See* App. Vol. I. 000399.  Mr. Booker admitted that while paperwork is filled out by the County of Essex as to whether the next of kin of the indigent person being buried was contacted, he states that he never undertook any efforts to locate, identify or notify an indigent client's next of kin.  *See* App. Vol. I. 000399.  Mr. Booker was not an individual listed under the NJ State Cemetery Act to authorize the interment of Michael's body, and as a result of his authorization (evidenced by his signature on the non-title interment order) Appellant was

8

never afforded the opportunity to direct the interment of her son's remains.  *See* App. Vol. I.

000397 and N.J.S.A. § 45:27-22, et.seq.

Following Michael's unceremonious pine box burial, Detective St. John transferred

Michael's missing persons case to Detective Anthony Faranda of the NYPD on the first of

October 2008.  Detective Faranda continued the investigation, and contacted Sergeant Cardona

of the Newark Police Department.   On April 20, 2011, Sgt. Cardona informed Detective Faranda

that a computer check of criminal history, complaints, accident, and "aided" reports yielded

negative results for Michael Simko.  Finally, on January 9, 2012 Detective Faranda performed

"various computer checks" and discovered that not only had Michael been dead for over four

years, he had been found by the Newark Police, identified shortly thereafter, and buried in

August of 2008 at Maple Grove Cemetery in Hackensack, New Jersey, where he remains to this

day.

## VI.     STATEMENT OF RELATED CASES AND PROCEEDINGS

There is currently pending a motion for reconsideration before the United States District

Court for the District of New Jersey, which was filed by the Appellant on April 11, 2014. *See*

App. Vol. I. 000300.  Newark filed an opposition to the Plaintiff/Appellant's motion on April 23,

2014, and EFS filed an opposition on May 02, 2014. *See* App. Vol. I. 000449 and 000471.

## VII.    SUMMARY OF THE ARGUMENT

As a result of the collective actions of the Appellees, Simkova was deprived her property

interest in the interment of her son's remains without due process, and further deprived the

ability to bury her son in accordance with her religious beliefs.  Newark and Garfield, by failing

to train their police officers and through its policies and customs, acted with deliberate

indifference to Simkova's constitutionally protected property interest in her son's remains.  The

Office of the State Medical Examiner and the Northern Regional Medical Examiner's Office (hereinafter jointly referred to as "Medical Examiner") failed to undertake any efforts to identify, locate and/or notify Simkova's son's next of kin, as did EFS, and eventually authorized the interment of Simkova's son's remains in direct violation of <u>N.J.S.A.</u> § 45:27-22(d).

This case differs from similar cases in that it is not being argued that the government *failed to take action.* *See* <u>Gazette v. City of Pontiac</u>, 41 F.3d 1061 (6th Cir. 1994)(*involving* a City Police force's failure to investigate and prevent the murder of Appellant's Mother). Here, each of the Appellees' actions contributed to the deprivation of Simkova's property interest in the remains of her son. Garfield prevented the Appellant from filing a missing persons report, which ultimately led to four years of uncertainty. Newark did not merely fail to find Simkova's son and return the remains to her. Instead they discovered his remains, sent them to the Medical Examiner's office, informed Ms. Simkova that her son was not with them, refused to file a missing persons report, and then actively represented to another agency searching for Simkova's son that they were not in possession of the remains. Following several months of a likely non-existent "investigation," Simkova's son's remains were buried in a mass grave between two other bodies, and Simkova was forever deprived of her property interest in the burial of her son's remains. The Medical Examiner made no efforts to locate Michael Simko's next of kin, and then authorized his burial in violation of <u>N.J.S.A.</u> § 45:27-22(d). EFS represented that they were the appropriate person to authorize the interment of Michael Simko's remains, contrary to the provisions of <u>N.J.S.A.</u> § 45:27.


## VIII.   ARGUMENT

The Due Process Clause of the Fourteenth Amendment provides that, "[n]o State shall…deprive any person of life, liberty, or property, without due process of law." U.S. Const.

Amend. XIV.  Title 42 U.S.C.A. § 1982 is the vehicle by which you can bring an action against a municipal defendant for a constitutional violation and it states:

> Every person who, under color of any statute, ordinance, regulation, custom or
> usage, of any State or Territory or the District of Columbia, subjects or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured…

Therefore, a § 1983 claim requires: (1) a deprivation of (2) a recognized property right (3) under color of state law.  <u>Newman v. L Sathyavaglswaranm M.D.</u>, 287 F.3d 786, 789 (9th Cir. 2002).

"State action" for § 1983 purposes includes the misuse of power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law or because the action was taken "under color of" state law.  State action under §1983 also includes an official's abuse of his position under color of any statute, ordinance, regulation, custom, or usage of any state or territory.  <u>Monroe v. Pape</u>, 365 U.S. 167 (1961).  Since the Defendants are municipalities and municipal agencies, the element of "state action" has been satisfied and should not bar the Appellant's complaint.

The Appellant has set forth sufficient allegations in her complaint to show that discovery will reveal the necessary elements of her constitutional claims against the Appellees.  She has shown that there was (1) a deprivation of (2) a recognized property right (3) under the color of state law and that the Appellees acted in concert with deliberate indifference to her constitutional rights.   Appellant's allegations demonstrate more than "the mere possibility of misconduct," and along with documents and information revealed by limited discovery, presents a "plausible inference" that the defendant inflicted a legally cognizable harm upon the Plaintiff/Appellant.

11

## A. THE APPELLANT HAS A RECOGNIZED PROPERTY RIGHT IN THE REMAINS OF HER SON

"Property interests are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state laws-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Board of Regents v. Roth, 408 U.S. 564, 577 (1972).

The Appellant has been deprived of a recognized and established property right to the remains of her son.  This right can be found in the New Jersey common law and New Jersey statutes and has even been acknowledged by the District Court of New Jersey.  The Supreme Court of New Jersey has held that a parent has a property right to control the funeral and disposition of the remains of a deceased child for the purpose of burial in accordance with the parents' wishes.  *See* Strachan v. John F. Kennedy Mem. Hosp., 109 N.J. 523 (1988). Furthermore, N.J.S.A. § 45:27-22, entitled the Cemetery Act provides that,

"If the decedent has not left a will appointing a person to control the funeral and disposition of the remains, the right to control the funeral and disposition of the human remains shall be in the following order, unless other directions have been given by a court of competent jurisdiction: … (3) The surviving parent or parents of the decedent."

The right to bury a dead body is a quasi property right, "the infringement of which may be redressed by an action in damages." *See* Strachan v. John F. Kennedy Mem. Hosp., 109 N.J. 523, 531 (1988); *see also* Spiegel v. Evergreen Cemetery Co., 117 N.J.L 90, 93 (Sup. Ct. 1936). This right specifically extends to the right to bury or otherwise lawfully dispose of a relative's remains.  *See* Lascurain v. City of Newark, 349 N.J. Super. 251, 270 (App. Div. 2002).

While the Third Circuit has not addressed this property right, the U.S. District Court for the District of New Jersey has assumed, for the purposes of deciding a motion, the existence of a

12

parent's property right in the remains of a deceased child.  *See* Thompson v. Robert Wood

Johnson Univ. Hosp., 2011 U.S. Dist. LEXIS 63980 (D.N.J 2011).  The property right of a

parent to control the remains of a deceased child is a right that has been recognized by every

branch of New Jersey's government.  This right has been recognized in statute, by the State's

Courts and by the District Court of New Jersey.  Additionally, it is common knowledge that a

parent can legally direct the burial of their child. Michael Simko was not married and did not

have any children. Therefore, as Michael Simko's parent, the Appellant's due process property

rights to her son's remains were clearly established and known to the Appellees.

### B.    BY FAILING TO TRAIN OR SUPERVISE THEIR OFFICERS AND THROUGH THE MAINTENANCE OF OFFICIAL CUSTOMS AND POLICIES, THE APPELLEES HAVE DEPRIVED THE APPELLANT OF HER CONSTITUTIONALLY PROTECTED RIGHTS

In her submitted complaint, Simkova has raised a reasonable expectation that discovery

will reveal the elements necessary to the show that Garfield and Newark's failure to supervise

and train its officers and/or its customs and policies along with the collective actions of the

Medical Examiner and EFS caused the deprivation of the Appellant's Constitutional rights.

A municipality can be found liable under § 1983 when the municipality itself causes the

constitutional violation at issue.  *See* Monell v. New York City Dept. of Social Services, 436

U.S. 658, 694-695 (1978).  A § 1983 claim is cognizable when there is a direct causal link

between a municipal policy or custom and the alleged constitutional deprivation.  *See* City of

Canton, Ohio v. Harris, 489 U.S. 378, 386 (1989).  When the policies and customs of the

municipality are the "moving force behind the constitutional violation" a municipality will be

liable under § 1983.  Polk County v. Dodson, 454 U.S. 312, 326 (1981).

Additionally, a municipality is liable when a valid policy is unconstitutionally applied by

a municipal employee, when the employee has not been adequately trained and the constitutional

wrong has been caused by that failure to train.  <u>Canton v. Harris</u>, 436 U.S. at 387. Where a municipality's failure to train, "in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983."  <u>Id</u>. 436 U.S. at 389.

In <u>Canton</u>, the Plaintiff Geraldine Harris was arrested and taken to the police stationhouse.  At the stationhouse, police officers noted that Mrs. Harris' remarks were incoherent.  Officers also witnessed Mrs. Harris fall to the floor on two occasions.  When Mrs. Harris was released from custody, she was taken to a nearby hospital by an ambulance that was provided by her family.  She was hospitalized for one week and received outpatient treatment for the following year.  Mrs. Harris brought a § 1983 claim against the municipality for its violation of her right under the Due Process Clause of the Fourteenth Amendment to receive necessary medical attention while in police custody.  <u>Id</u>. 436 U.S. at 382.

The District Court noted that the evidence could be found to demonstrate that the City of Canton's custom or policy vested complete authority with the police supervisor to determine when medical treatment would be administered to prisoners.  The District Court further noted that the jury could find from the evidence that the vesting of such authority with the police supervisor without adequate training to recognize when medical treatment is needed was grossly negligent or so reckless that future police misconduct was almost inevitable or substantially certain to result.  <u>Id</u>. 436 U.S. at 382.  The Supreme Court remanded the case to the trial court for a determination of whether the municipality's conduct reached the level of "deliberate indifference" to the Plaintiff's constitutionally protected rights.  <u>Id</u>. 436 at 392.

On November 26, 2007, Simkova attempted to file a missing persons report for her son with Garfield.  Garfield refused to take her complaint and told the Appellant that she had to file a

report with the NYPD.  Michael Simko's body had been found in Newark, New Jersey on

November 23, 2007 and was identified by the Newark as early as November 24, 2007.  On

December 1, 2007, Simkova attempted to file a missing persons report for her son with the

Newark Police Department.  The Newark Police Department refused to take her complaint and

told the Appellant that they had seen Michael Simko alive and well the day before. Michael

Simko's body was found by Officer Jones of the West Precinct of the Newark Police

Department.  After Simkova's son was identified and known to the Newark Police, a

representative of the New York Police Department contacted Newark to inquire as to whether or

not Michael Simko was in Newark, and Newark represented that he was not.  By refusing to

accept a missing persons report from Simkova and by directing the search for Michael Simko

away from where his remains actually were, Newark actively impeded any efforts to identify,

locate and notify Michael Simko's next of kin. Newark acted with a deliberate indifference to her

property rights in the remains of her son.  Additionally, like in Canton, their failure to train their

officers and the customs and policies they maintained made the constitutional deprivations

almost inevitable or substantially certain to result.

Furthermore, had Garfield filed a missing person's report for Michael Simko, all

authorities would have been aware that Michael Simko's mother lived approximately 15 miles

from where his body was found.  Therefore, by Garfield refusing to file her missing person's

report, the wheels were set in motion to preclude her from finding out for more than four (4)

years that Michael Simko's body was buried in a mass grave.

The Appellant's Complaint provides sufficient factual allegations to show that discovery

is likely to yield the elements necessary to establish the Appellant's claims.  The Complaint cites

to "Patricia's Law" and the legislative history behind the law for the purpose of bolstering the

Appellant's § 1983 claims and establishing the need for further discovery.  The legislative

history indicates that "Patricia's Law" was enacted in order to address problematic customs and

practices regarding missing persons investigations, engaged in by local law enforcement

agencies in New Jersey.  The law specifically sought to address the customs and policies of law

enforcement agencies to wait for a specific period of time or for a specific set of circumstances

to accept a report of a missing person.  In an attempt to rectify the shortcomings of the customs

and practices of local law enforcement, Patricia's Law provides:

> "A law enforcement agency shall accept without delay any report of a missing
>
> person. No law enforcement agency may request to accept a missing person report
>
> on the basis that: (1) The missing person is an adult; (2) The circumstances do not
>
> indicate foul play; (3) The person has been missing for a short period of time; (4)
>
> The person had been missing for a long period of time; (5) There is no indication
>
> that the missing person was in the jurisdiction served by the law enforcement
>
> agency at the time of disappearance…" N.J. Rev. Stat. § 52:17B-213 (2013).

The March 31, 2014 Order issued by the New Jersey District Court dismissing

Appellant's claim must be reversed and this action remanded to the District Court for trial on

whether the Defendant's conduct constituted "deliberate indifference" to Simkova's property

interest in the burial of her son because the allegations presented in Simkova's Complaint are

sufficient to state a cognizable claim upon which the Appellant may recover.  Discovery can

reasonably be calculated to provide the necessary element that Newark and Garfield maintained

the customs and policies that violated the appellant's constitutional rights and that the legislature

addressed by enacting "Patricia's Law".  Any patrol guide, manual, training material or

handbook maintained by the Garfield and Newark Police Department from 2007 would likely

memorialize the policies and training that led to the deprivation of the Appellant's constitutional rights.  Furthermore, it is likely that depositions of members of the Newark and Garfield Police will reveal the deficiencies or failures in their policies and customs as related to missing persons at the time of Simkova's son's death.

Additionally, there may have been an unwritten policy for Garfield and Newark to refuse to accept a missing persons report unless certain criteria had been met (i.e. duration of time missing, location last seen or residence of missing person).  Newark and Garfield refused to accept the Simkova's missing persons report on multiple occasions and actively misrepresented to the Appellant about Michael Simko's location.  Discovery will likely show that the Newark and Garfield failed to train their police officers in the timely acceptance of missing persons complaints or the usage of missing persons databases like National Missing and Unidentified Persons System (NamUs) or the National Crime Information Center (NCIC). Newark and Garfield's customs and policies and failure to train their officers in the handling of missing persons investigations, caused the constitutional deprivation suffered by the Simkova. Moreover, Newark and Garfield acted with deliberate indifference to the Appellant clearly established property right to possess and bury the body of her son in accordance with her religious beliefs.

The issue is not whether the Appellees had an affirmative duty to act, but whether their customs and policies and the failure to train amounted to a "deliberate indifference" to the Appellant's established property right.  The Appellant has provided sufficient factual allegations to raise a reasonable expectation that discovery will reveal elements necessary to the Appellant's Complaint.  She has shown that there was (1) a deprivation of (2) a recognized property right (3)

under the color of state law and that the Appellees acted in concert with deliberate indifference to her Constitutional rights.


C.    **IT IS CLEAR FROM THE LANGUAGE OF N.J.S.A. § 45:27-22 THAT THE LEGISLATURE INTENDED TO CREATE A PRIVATE CAUSE OF ACTION FOR A VIOLATION OF THE STATUTE**

N.J.S.A. § 45:27-22(d) specifically provides that:

> A person who signs an authorization for the funeral and disposition of human remains warrants the truth of the facts stated, the identity of the person whose remains are disposed of and the authority to order the disposition. The person shall be liable for false statements or breach of warranty.

Therefore, the statute contemplates a private cause of action for those who authorize the disposition of a person's remains.  From the plain language of the statute, the cause of action applies to any person who authorizes the disposition of human remains. In the present case, Garfield and Newark refused to accept Simkova's missing persons report, and failed to undertake any substantive efforts to identify locate and notify Simkova of her son Michael's death and the discovery of his remains.  The Medical Examiner failed to undertake any efforts to ensure there were no next of kin available to authorize the interment of Simkova's son's remains, as did Eternity Funeral Services, L.L.C., and the remains were interred in direct violation of N.J.S.A. § 45:27-22(d).  *See* App. Vol. I. 000397 showing Aree Booker's signature as the authorizing agent for Michael Simko's interment.

Clearly from the plain language of the statute, the legislature has authorized a private cause of action against those who authorize the disposition of human remains.  Therefore, the Appellees must be liable for their role in authorizing or allowing the authorization of the disposition of Michael Simko's body or for providing false statements leading to the

authorization of the burial.  Further discovery is likely to reveal the extent of each parties' particular failings, and acts which constitute deliberate indifference towards Simkova's due process property interest in the interment of her son's remains.

      **D.**      **THE APPELLEES HAVE VIOLATED THE APPELLANT'S FIRST AMENDMENT RIGHTS BECAUSE THEY HAVE SUBSTANTIALLY AND TOTALLY BURDENED THE APPELLANT'S RIGHT TO BURY HER SON IN ACCORDANCE WITH HER RELIGION**

The First Amendment prohibits the government from burdening the free exercise of religion.  *See* United States v. Lee, 455 U.S. 252, 256-257 (1982).  The burden on religion must be "substantial" to implicate the First Amendment. In order to establish a "substantial" burden the Plaintiff must allege that the state action is either compulsory or coercive in nature.  *See* Lee v. Wiesman, 505 U.S. 577, 621 (1992).

In the instant case, the Appellees collective action has placed a "substantial" burden on the Simkova's exercise of her religious beliefs.  Newark made misrepresentations to Simkova and the N.Y.P.D. about Simkova's son's remains whereabouts.  Garfield refused to accept the filing of a missing persons report, which set in motion his eventual burial in a mass grave.  The Medical Examiner had possession of Michael Simko's remains until August 2008, when the remains were delivered to EFS and both parties authorized the interment.  At no point did the any of the parties even attempt to contact Simkova about possession of her son's remains.  The burial of a relative is an inherently religious event that includes ceremonies paramount to one's religion. The burial of Michael Simko's remains in a mass grave was a total and complete deprivation of the Appellant's right to exercise her religion and bury her son in accordance with her religious beliefs.

The right to bury one's offspring is a clearly established right in the State of New Jersey. *See* N.J.S.A. § 45:27-22.  Therefore, Simkova has presented enough facts to indicate that

discovery will provide the necessary element to show that the Appellees placed a "substantial" burden on her right to exercise her religion.

## IX.    CONCLUSION

For the reasons stated above, this Court must reverse the March 31, 2014 Order issued by the New Jersey District Court dismissing Appellant's claim, and this action should be remanded to the District Court for trial on whether the Defendant's conduct constituted "deliberate indifference" to Simkova's property interest in the burial of her son because the allegations presented in Simkova's Complaint are sufficient to state a cognizable claim upon which the Appellant may recover.


                                                        Respectfully Submitted,

Dated: July 22, 2014

                                                        Peter E. Briskin
                                                        Attorney for the Appellant/Plaintiff

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to L.A.R. 46.1 that the attorney whose name appears on the Brief of Appellant was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit in 2014, and is presently a member in good standing at the Bar of said court.

Dated: July 22, 2014

Peter E. Briskin, Esquire
Attorney for the Appellant/Plaintiff

## IDENTICAL PDF AND HARD COPY CERTIFICATE

The undersigned hereby certifies that the PDF file and hard copies of this brief are identical.

Dated: July 22, 2014

Peter E. Briskin, Esquire
Attorney for the Appellant/Plaintiff

## VIRUS SCAN CERTIFICATE

This e-mail and the attached brief have been automatically scanned during preparation and upon sending by the following virus detection programs: Symantec software program, and no viruses were detected.

Dated: July 22, 2014

Peter E. Briskin, Esquire
Attorney for the Appellant/Plaintiff

## **CERTIFICATION OF TYPE-VOLUME COMPLIANCE**

 Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that this brief

complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure

32(a)(7)(B) and contains 6,196 words.

Dated July 22, 2014

_____

Peter E. Briskin

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this date, this Brief was filed electronically through the Third Circuit's CM/ECF system and served via CM/ECF system, and seven copies were mailed to:

Office of the Clerk
United States Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790


In addition, one copy was served by U.S. Mail, on the following counsel of record:

Mr. Anthony Pasquarelli, Esq. (tonyp.inslaw@verizon.net)
17A Joyce Kilmer Avenue North,
P.O Box 674
New Brunswick, New Jersey 08903

Mr. Gary Lipshutz, Esq. (lipshutzg@ci.newark.nj.us)
Assistant Corporation Counsel
920 Broad Street,
Newark, New Jersey 07102

Mr. Robert Murphy, Esq. (robert.murphy@lps.state.nj.us)
Deputy Attorney General
25 Market Street,
P.O. Box 116
Trenton, New Jersey 08625-0116

Mr. Joseph Defuria, Esq. (jdefuria@gpmlegal.com)
524 Union Avenue, P.O. Box 96
Belleville, New Jersey 07109

Dated: Newark, New Jersey, July 22, 2014.

Peter E. Briskin, Esq.
*Counsel for Plaintiff/Appellant*

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 14-2076

_____

ZDENKA SIMKOVA
Plaintiff/Appellant

v.

CITY OF NEWARK,
NEWARK POLICE DEPARTMENT,
CITY OF GARFIELD, GARFIELD POLICE
DEPARTMENT, OFFICE OF THE NEW
JERSEY STATE MEDICAL EXAMINER,
ETERNITY FUNERAL SERVICES, L.L.C,
ZHONGXUE HUA, M.D. Ph.D.(Individually
and in his official capacity), MONICA
CALDERONE (Individually and in her official
capacity),
Defendants/Appellees

_____

On Appeal from the United States District Court
for the District of New Jersey, Newark Vicinage
Civil Action No. 2:13-CV-01264
(Honorable Katharine S. Hayden, District Judge)

_____

APPENDIX VOLUME I

_____

Peter E. Briskin
FISHBEYN & BRISKIN, L.L.C
17 Academy Street, Suite 1200
Newark, New Jersey 07102
(908) 279-7979


Counsel for Appellant

## <u>TABLE OF CONTENTS</u>

Notice of Appeal………………………………………………………....App. Vol. I. 000001

Final Order Dismissing Complaint…………………………………………App. Vol. I. 000004

Opinion of the Court………………………………………………………..App. Vol. I. 000006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Peter E. Briskin, Esquire  /PB 7135/
Fishbeyn & Briskin, P.C.
Attorneys for Plaintiff
ZDENKA SIMKOVA
17 Academy Street, Suite 1200
Newark, New Jersey 07102
Phone: (908) 279-7979
Fax: (908) 279-7980

---

**ZDENKA SIMKOVA,**

**Plaintiff**

**vs.**

**CITY OF NEWARK,
NEWARK POLICE DEPARTMENT,
CITY OF GARFIELD, GARFIELD POLICE
DEPARTMENT, OFFICE OF THE NEW
JERSEY STATE MEDICAL EXAMINER,
ETERNITY FUNERAL SERVICES,LLC,
ZHONGXUE HUA, M.D. Ph.D.(Individually
and in his official capacity), MONICA
CALDERONE (Individually and in her official
capacity), JOHN DOES "A" through "Z"
(fictitious names used to describe unknown
defendants acting individually and in their
official capacity), and ABC CORPORATIONS
"A" through "Z" (fictitious names used to
describe unknown defendants).**

**Defendants**

Civil Action No.:2:13-cv-01264-KSH-PS

Hon. Katherine S. Hayden, U.S.D.J.

**Notice of Appeal to the
U.S. Court of Appeals for the
Third Circuit**

---

Notice is hereby given that _____ZDENKA SIMKOVA_____

(Named Party)

appeals to the United States Court of Appeals for the Third Circuit from

[  ] Judgment, [ X ] Order, [  ] Other _____

(Specify)

of the United States District Court, District of New Jersey, entered in this action on

March 31, 2014_____ .
(Date)

Dated: April 29, 2014

Peter E. Briskin, Esquire  /PB 7135/
Fishbeyn & Briskin, P.C.
Attorneys for Plaintiff
ZDENKA SIMKOVA
17 Academy Street, Suite 1200
Newark, New Jersey 07102
Phone: (908) 279-7979
Fax: (908) 279-7980

App. Vol.I. 000003

**United States District Court**
**for the District Of New Jersey**

|  |  |
|---|---|
| ZDENKA SIMKOVA<br><br>        Plaintiff,<br><br>  v.<br><br>CITY OF NEWARK; NEWARK POLICE DEPARTMENT; CITY OF GARFIELD; GARFIELD POLICE DEPARTMENT; OFFICE OF THE NEW JERSEY STATE MEDICAL EXAMINER; ETERNITY FUNERAL SERVICES, LLC; ZHONGXUE HUA, M.D. Ph.D; MONICA CALDERON<br><br>        Defendants. | Civil No.: 13-1264 (KSH)<br><br><br><br><u>**Final Order**</u> |

This matter having come before the Court on defendants' motions to dismiss [D.E. 10, 11, 16], and for the reasons set forth in the accompanying opinion [D.E. 50],

**IT IS**, on this 31st day of March, 2014,

**ORDERED** that the defendants' motions to dismiss [D.E. 10, 11, 16] are **GRANTED**; and it is further

**ORDERED** that the federal claims against the remaining parties—individual defendants Hua, Calderon, and Eternity Funeral Services—are **DISMISSED** *sua sponte*; and it is further

**ORDERED** that the Court declines to exercise supplemental jurisdiction over the state-law claims; and it is further

**ORDERED** that the complaint [D.E. 1] is dismissed; and it is further

**ORDERED** that the Clerk of the Court shall close the case.

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

Not for Publication

## United States District Court
## for the District Of New Jersey

ZDENKA SIMKOVA

Plaintiff,

v.

CITY OF NEWARK; NEWARK POLICE
DEPARTMENT; CITY OF GARFIELD;
GARFIELD POLICE DEPARTMENT; OFFICE
OF THE NEW JERSEY STATE MEDICAL
EXAMINER; ETERNITY FUNERAL
SERVICES, LLC; ZHONGXUE HUA, M.D.
Ph.D; MONICA CALDERON

Defendants.

Civil No.: 13-1264 (KSH)

**Opinion**

**Katharine S. Hayden, U.S.D.J.**

In January 2012, plaintiff Zdenka Simkova ("Simkova") learned that her son, Michael

Simko ("Michael")—who went missing in 2007 over the Thanksgiving holidays and had never

been located—had died years earlier and was buried in a mass grave in Hackensack. She filed a

federal lawsuit detailing both the resistance she faced after she reported him missing within days

after he failed to show up at her house and the misinformation she received from official sources.

Over four counts in her complaint [D.E. 1], three of which were based primarily on federal

constitutional claims, Simkova alleged that the defendants failed to follow proper procedures for

the identification and investigation of missing persons—a result, in part, of the municipal

defendants' policies and their failure to train their employees—thereby depriving her of her right

to possess her son's body and to bury him in accordance with her religion.

1

Presently before the Court are three motions to dismiss the complaint, filed by the City of Newark and its police department (hereinafter the "Newark defendants" or "Newark"), the City of Garfield and its police department (hereinafter the "Garfield defendants" or "Garfield"),[1] and the Office of the New Jersey State Medical Examiner.  [D.E. 10, 11, 16.]  The moving defendants argue that the complaint fails to state a valid federal constitutional claim and that certain of the defendants are immune from suit in federal court.  The Court held oral argument on the motions.  For the following reasons, they are granted, and the Court dismisses *sua sponte* the remaining, non-moving defendants.

## I. The Complaint

### A) Factual Background

Michael, then 27 years old and residing in Jamaica, Queens, was supposed to visit his mother in Garfield, New Jersey, over Thanksgiving 2007.  He never arrived.  (Compl. ¶¶ 16–18.)  Simkova went to the 113th Precinct in Queens, New York, on or about November 22, and filed a missing persons report which included Michael's name, photograph, description, and that he had been last seen in Newark.  (Compl. ¶¶ 20–21.)

Simkova went to the Garfield Police Department on November 26 to file another missing persons report.  However, officers there refused to process the request, telling Simkova that she needed to file a report in New York City, which she had already done.  (Compl. ¶¶ 19–21.)

Because Michael had last been seen in Newark, Simkova went to the Newark Police Department on December 1.  Officers there informed her that they had seen Michael the previous day, when he had asked to stay overnight in the precinct.  (Compl. ¶¶ 21–22.)  Simkova returned

---

[1] The police departments and the municipalities are considered the same entity for the purposes of liability.  *See Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n.4 (3d Cir. 1997).

2

to the precinct on December 9, where she was again told that Michael had been seen alive recently in the area. Both times, officers refused to process a missing persons report. (Compl. ¶¶ 21–23.) Simkova also attempted to post flyers around Newark Penn Station, but police officers whom she identifies as coming from Newark Police Department stopped her and again did not let her file a missing persons report. (Compl. ¶ 24.)

In fact, on November 23, Michael's body had been discovered at 34 Mercer Street in Newark. (Compl. ¶ 29.) He was identified by his fingerprints on November 27 by defendant Zhongxue Hua, a medical examiner, who determined that the cause of death was a mixture of heroin and alcohol. (Compl. ¶ 30; *see also* Autopsy Report [D.E. 14-2].) The complaint alleges that Hua did not notify Simkova or "the appropriate officials," and Michael's body laid unclaimed until it was turned over to defendant Eternity Funeral Services in August 2008. He was buried in a mass grave at Maple Grove Cemetery in Hackensack. (Compl. ¶¶ 31–32.)

In January 2012, the New York Police Department called Simkova and told her about Michael's death, instructing her to contact the local medical examiner's office. (Compl. ¶ 25.) Simkova went to the Northern Regional Medical Examiner's office and spoke with defendant Monica Calderon, an employee of the New Jersey State Medical Examiner. Through pictures that Calderon showed her, Simkova positively identified Michael. (Compl. ¶¶ 26–28.)

### B) Defendants and Grounds for Relief

The complaint was filed on March 1, 2013 against the Garfield and Newark defendants, the State Medical Examiner, Eternity Funeral Services (hereinafter "Eternity"), Hua, and Calderon, as well as several John Does and unnamed corporations. Hua and Calderon are sued in their official and individual capacities. (Compl. ¶¶ 5–15.)

App. Vol. I. 000008

Counts one and two of the complaint charge the Garfield and Newark defendants, the

Medical Examiner, and Eternity (but not the individual defendants) with failure-to-train/official-

policy-or-custom claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act,[2] premised

on the deprivation of Simkova's due process right to possess the body of her son.  (Compl.

¶¶ 48–59.)  Count three, also arising under § 1983, alleges First Amendment free exercise

violations by all of the defendants.  (Compl. ¶¶ 60–64.)  Count four is a New Jersey state-law

claim charging all defendants with violating New Jersey statutory and common law.  (Compl.

¶¶ 65–68.)  Simkova seeks compensatory damages, prejudgment interest, punitive damages,

costs, and fees.  (Compl. 12.)

The complaint references two New Jersey laws in the course of its allegations.  The first,

N.J.S.A. § 45:27-22, is entitled "Control of funeral, disposition of remains," and in pertinent part

sets out the order of persons to be notified in connection with the disposition of human remains

in the absence of instructions.  Simkova contends that this statute and New Jersey common law,

in addition to providing the basis for ground four of the complaint, give parents "a property right

. . . to control the funeral and disposition of the remains of a deceased child," which is "entitled

to due process protection and [is] actionable under 42 U.S.C. § 1983."  (Compl. ¶¶ 46–47.)  The

complaint also cites to two parts of "Patricia's Law," which went into effect in August 2008 and

altered certain New Jersey reporting and investigative procedures: N.J.S.A. § 52:17B-213, which

is the portion requiring the acceptance of missing persons reports; and § 52:17B-220, which

governs the conduct of medical examiners' offices, requiring among other things that they

coordinate with law enforcement when handling the remains of a missing person.

---

[2] As the complaint references the New Jersey Constitution, the Court will assume that plaintiff
intended to plead a New Jersey Civil Rights Act claim.

4

## II. Jurisdiction and Standard of Review

Except as indicated otherwise below, the Court exercises federal-question jurisdiction

over Simkova's federal constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343. In

evaluating a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Court accepts all well-pleaded

allegations in the complaint as true and draws all reasonable inferences in Simkova's favor. The

complaint survives dismissal under the now-familiar *Twombly/Iqbal*[3] standard if those

allegations and reasonable inferences show that she has a plausible claim for relief—a "context-

specific" analysis that also requires the Court to disregard legal conclusions masquerading as

facts. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). Although the court

may consider "exhibits attached to the complaint, matters of public record, as well as

undisputedly authentic documents if the . . . claims are based on these documents," *Mayer v.

Belichick*, 605 F.3d 223, 230 (3d Cir. 2010), the complaint itself remains the focus of inquiry,

*Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994).

The parties attached to their papers exhibits relating to both the facts and procedural

underpinnings of the case. For example, Simkova attached Hua's autopsy report to her

opposition to the City of Garfield defendants [*see* D.E. 14-2], and the Medical Examiner

submitted an affidavit attesting to Simkova's failure to file a Tort Claims notice [*see* D.E. 16-5].

At oral argument, the parties attempted to reconcile some of the facts contained in these

submissions with the allegations of the complaint, especially those pertaining to the chronology

of Simkova's efforts to file police reports, the issues surrounding the possession of Michael's

body, and the extent of the investigation into Michael's identity. For example, counsel for the

Newark defendants used a copy of the New York City police report to show that it was filed after

---

[3] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U. S. 544 (2007).

App. Vol.I. 000010

Simkova's visit to the Garfield police, not before. As the Court said during oral argument, matters outside of the complaint would be considered to the extent that they did no violence to the dismissal standard or the Federal Rules in general. Additionally, it was generally agreed among counsel that the operative facts are not in dispute; rather, the issue is whether Simkova has mounted constitutional claims. Mindful of the motion to dismiss standard and that none of the parties seeks summary judgment, the Court will generally rely upon the allegations of the complaint.

### III. Discussion

#### A) Eleventh Amendment Immunity

The Medical Examiner contends that his office is entitled to the protection of Eleventh Amendment immunity, and thus cannot be sued in federal court. (Medical Examiner Moving Br. 4–6 [D.E. 16-4].) Under the Eleventh Amendment, and with exceptions not relevant in this case, "[s]tate governments and their subsidiary units are immune from suit in federal court." *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 551 F.3d 193, 195 (3d Cir. 2008).

The motion is captioned as brought under Fed. R. Civ. P. 12(b)(6), but an Eleventh Amendment defense, which is jurisdictional, is more properly brought under Fed. R. Civ. P. 12(b)(1). *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693 n.2 (3d Cir. 1996). When the jurisdictional challenge is a factual one, as here, the Court can reach outside of the complaint to address the documents submitted in support of (and in opposition to) the motion, *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977), and can draw inferences in the moving party's favor if the evidence so warrants, *S.R.P. v. United States*, 676 F.3d 329, 343 (3d Cir. 2012). The burden remains on the moving party to show that it is entitled to immunity. *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995).

App. Vol.I. 000011

At issue is whether the Medical Examiner falls into the broader category of "state governments and their subsidiary units." In order to answer this question, the Court looks to the "*Fitchik*" factors: (1) whether the payment of a judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has. *Fitchik v. N.J. Transit Rail Ops., Inc.*, 873 F.2d 655, 659–60 (3d Cir. 1989). All factors must be considered equally. *Bowers v. NCAA*, 475 F.3d 524, 546 (3d Cir. 2007).

The actual entity sued in the complaint is "the Office of the New Jersey State Medical Examiner." By statute, New Jersey law establishes this office in the Division of Criminal Justice in the state's Department of Law and Public Safety. N.J.S.A. § 52:17B-79. The Examiner himself/herself is a gubernatorial appointee, and the office has "general supervision over all county medical examiners," with the power to "promulgate such rules and regulations as he may deem necessary to effectuate the provisions of this act." N.J.S.A. § 52:17B-79 to 80. Supplies for the state office are furnished by the attorney general. N.J.S.A. § 52:17B-81. Employees of the broader Division of Criminal Justice, except for secretarial and clerical personnel, are in the "unclassified service of the civil service of the State." N.J.S.A. § 52:17B-100(b).

Based on this statutory scheme, it is clear that the main state Medical Examiner's office is an alter ego of the state as a subsidiary unit of the state itself. The Department of Law and Public Safety is an executive branch of the state government. *See* N.J.S.A. § 52:17B-1. The state budgets funds for the Department in its annual appropriations bills, which include the Medical Examiner's office under "direct state services." *See, e.g.*, 2009 N.J. P.L. ch. 68, 138, *available at* http://www.njleg.state.nj.us/2008/Bills/AL09/68_.PDF. In this District, the Department and its subdivisions have been found to be protected by the Eleventh Amendment. *See, e.g., Druz v. Noto*, No. 09-5040, 2010 WL 2179550, at *4–5 (D.N.J. May 28, 2010)

7

App. Vol.I. 000012

(Wolfson, J.) (finding the Department to be immune), *aff'd*, 415 F. App'x 444 (3d Cir. 2011); *Longoria v. New Jersey*, 168 F. Supp. 2d 308, 315–16 (D.N.J. 2001) (Orlofsky, J.) (finding that the State Police, then organized under the Department, was an "arm of the state"). An unpublished Appellate Division opinion has found that "the Medical Examiner's Office was not subject to suit under § 1983, as it was a State department discharging its official duties regarding the autopsy of decedent." *Newman v. Benitez*, No. A-6710-03T3, 2006 WL 1210684, at *20 (App. Div. May 4, 2006) (per curiam). All of the *Fitchik* factors support a finding of Eleventh Amendment immunity.

However, Hua was not an employee of the main Examiner's office, but was instead with the Northern Regional office. So Simkova argues that the *Fitchik* factors are not satisfied because the regional offices are funded by and controlled by the counties they serve, with the counties reimbursing the state for various costs. (Simkova Medical Examiner Opp'n Br. 10–12 [D.E. 26].) In making the argument, Simkova is referring to the county medical examiners created under state law. Although the main statutes laying out the duties of these county examiners fall under the Law and Public Safety subchapter, the statutes elsewhere position county examiners within the subchapter dedicated to municipal and county employees. Unlike the main state Examiner, the county examiners are appointed by county boards of chosen freeholders, and their salaries, expenses, and facilities are provided for and maintained out of county budgets. N.J.S.A. §§ 40A:9-46, 52:17B-85.

While individual counties can run their own offices, they can also join inter-counter cooperatives. *See* N.J.S.A. § 52:17B-83. The regional offices, Northern and Southern, are two such cooperatives. The parties agree that the Northern Regional office covers Essex, Hudson, Passaic, and Somerset counties; Essex has no "county" office of its own.

Simkova's argument against state alter-ego status for the regional offices exposes a statutory gap: while New Jersey law allows for the inter-county cooperatives, the management and funding structure of the cooperatives is not defined. At issue is whether they resemble individual county offices, as Simkova urges, or are state-office subdivisions, as argued by the Medical Examiner.

Simkova relies principally on N.J.S.A. § 52:17B-83, which sets forth that "the treasurer of the county or counties, as the case may be, shall reimburse the Office of the State Medical Examiner or its designee for all costs incurred in properly conducting the county's death investigations and performing all other functions of the county medical examiner." (Simkova Medical Examiner Opp'n Br. 11.) That language refers, however, only to circumstances where counties fail to appoint medical examiners or the office becomes vacant, requiring the state to "take[] over the duties of a county medical examiner," and not to inter-county cooperatives. It is not applicable here.

In fact, the record evidence weighs strongly in favor of a state-subdivision finding. Attached to Simkova's opposition brief is a page from the Department's website that describes the organization and operation of the Southern Regional office, comprising Cape May and Cumberland counties. [D.E. 26-4.] According to the page:

> The counties entered into a contract with the Department of Law and Public Safety, whereby the Division of Criminal Justice provides death investigations, medical examiner services and toxicology analysis on a fee-for-service basis. The counties reimburse the state for the cost to operate the office.
>
> The staff at the Southern Regional Medical Examiner Office investigate the cause and manner of death in accordance with the NJ State Medical Examiner Act . . . . They conduct medico legal investigations, autopsies and other post-mortem analysis to provide county prosecutors and other law enforcement agencies with testimony, laboratory results and other necessary data and evidence . . . . The daily operation of the office . . . is under the direct supervision of a Medical Examiner, who reports to the State Medical Examiner.

9

Simkova interprets this language, and the funding structure from N.J.S.A. § 52:17B-85, to mean

that the Northern Regional office is "financially independent" from the state and is "controlled"

by the component counties. (Simkova Medical Examiner Opp'n Br. 11–12.) But a more

plausible reading is that the counties have created a financial cooperative, which otherwise cedes

control of the Regional office to the state; and, from the record, it is reasonable to infer that the

Northern Regional office is organized the same way as the Southern Regional office. This

inference is bolstered by 1) Assistant State Medical Examiner Roger Mitchell's certification that

he works for both Northern and Southern offices (*see* Mitchell Decl. ¶ 1 [D.E. 35-1]),[4] and 2) the

letterhead used by the Northern Regional office throughout the record, which reflects a position

within the larger State Medical Examiner's office. Thus, while the second *Fitchik* factor, status

under state law, may be ambiguous as applied here, the third, autonomy, weighs in favor of a

finding of Eleventh Amendment immunity.

  That leaves the first *Fitchik* factor: how a money judgment would be paid. As the state

actually operates the Northern office pursuant to the inter-county cooperative, a suit against the

Northern Regional office would be functionally equivalent to a suit against the main Medical

Examiner's office and, thus, against the state itself. Simkova raises the question of

indemnification, but as the Supreme Court has held:

> it is the entity's potential legal liability, rather than its ability or inability to
> require a third party to reimburse it, or to discharge the liability in the first
> instance, that is relevant. . . . The Eleventh Amendment protects the State from
> the risk of adverse judgments even though the State may be indemnified by a third
> party.

*Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 431 (1997); *accord Benn v. First Judicial*

*Dist. of Pa.*, 426 F.3d 233, 240–41 (3d Cir. 2005) (holding that neither local funding nor

---

[4] At argument, Simkova objected to the Mitchell affidavit, characterizing it as a self-serving
document that was introduced via a reply brief. It is considered only to the extent set forth
above.

App. Vol.I. 000015

indemnification defeated Eleventh Amendment immunity).  The reasonable inferences drawn

from the record compel the conclusion that a suit against the Northern Regional office is

equivalent to a suit against the state under the *Fitchik* test.

For the above reasons, the Court holds that the Medical Examiner is protected from suit

by Eleventh Amendment immunity as an alter ego of the state; and to the extent that Simkova

intended to sue the Northern Regional office, the office is equivalent to the main Medical

Examiner.  The Medical Examiner will be dismissed from this suit.

### B) Federal Due Process Claims under 42 U.S.C. § 1983

Counts one and two accuse the municipal defendants and non-movant Eternity of

violating Simkova's due process rights.  As lodged against the municipalities, these are

commonly called *Monell* claims, after *Monell v. Department of Social Services*, 436 U.S. 658

(1978), and can be based on (as here) an unconstitutional policy or custom or an unconstitutional

failure to train. *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 274–76 (3d Cir. 2000).  Municipalities

cannot be held liable under theories of *respondeat superior*. *Mulholland v. Gov't Cnty. of Berks*,

706 F.3d 227, 237 (3d Cir. 2013).

Due process, the basis of each claim, protects against arbitrary government action, and

has substantive and procedural components. *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650,

658 (3d Cir. 2011). "To state a claim under § 1983 for deprivation of procedural due process

rights, a plaintiff must allege that (1) [s]he was deprived of an individual interest that is

encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2)

the procedures available to h[er] did not provide due process of law." *Hill v. Borough of*

*Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006) (internal quotation marks & citation omitted).

"The elements of a substantive due process claim are that: (i) defendants acted under color of

11

law; (ii) a protected property or liberty interest was at stake; (iii) the defendants had a duty of care toward the plaintiff; and (iv) a deprivation within the meaning of the due process clause occurred." *Roberts v. Mentzer*, 382 F. App'x 158, 166 (3d Cir. 2010) (nonprecedential) (interpreting *Fagan v. City of Vineland*, 22 F.3d 1296, 1310 (3d Cir. 1994)). "To establish a substantive due process violation by a municipality, a plaintiff must show that executive action was so ill-conceived or malicious that it shocks the conscience." *Mulholland*, 706 F.3d at 241 (internal quotation marks & citation omitted).

The parties dispute whether parents have an actionable property interest in the bodies of their deceased children. Simkova relies on decisions from outside the Third Circuit where parents have sued over the removal of corneas from the deceased. *See, e.g., Newman v. Sathyavaglswaran*, 287 F.3d 786, 796–97 (9th Cir. 2002) ("[W]e hold that the parents had property interests in the corneas of their deceased children protected by the Due Process Clause of the Fourteenth Amendment."); *Whaley v. Cnty. of Tuscola*, 58 F.3d 1111, 1116 (6th Cir. 1995). These decisions, however, may be limited in scope to corneal-tissue or other anatomical-gift contexts. *See Shelley v. Cnty. of San Joaquin*, 954 F. Supp. 2d 999, 1006–07 (E.D. Cal. 2013) (finding, in qualified immunity ruling, that *Newman* "did not clearly establish a broader property interest to the entire body," and that the Sixth Circuit decisions "have since been effectively overruled by the Michigan and Ohio supreme courts respectively on certified questions").

Because the question is unsettled in this Circuit, the Court will assume that the property interest exists for the purposes of addressing the merits and meeting the arguments made at oral argument, and will turn first to whether the complaint adequately states the other essential element of a due process claim: a deprivation. *See Mulholland*, 706 F.3d at 242 ("The initial

App. Vol.I. 000017

question in a section 1983 action is whether the plaintiff has alleged a deprivation of a constitutional right at all." (internal quotation marks & citation omitted)).  And having examined the complaint, the case law, and the issues raised by the parties during briefing and at argument, the Court is constrained to find that Simkova fails to state a due process cause of action entitling her to relief against the municipal defendants.  The events the complaint describes are disturbing and painful, but in the specialized context of a constitution-based lawsuit, the settled law on the rights of due process cannot support a cause of action based on what happened.

As a preliminary issue, the complaint does not actually identify any unconstitutional policy implemented by the municipalities that led to the actions of the individual officers in the case.  At oral argument, counsel for Simkova made reference to inter-jurisdictional databases and information sharing to suggest what Garfield and Newark should have done, but none of this detail is in the complaint.  Instead, Simkova argues that the pending motions to dismiss should be denied precisely so that she may gain access to handbooks and other materials that "memorialize" the policies or training failures leading to the alleged constitutional deprivations. (*See, e.g.,* Simkova Garfield Opp'n Br. 13–14.) *See Fowler v. UPMC Shadyside,* 578 F.3d 203, 213 (3d Cir. 2009) (articulating the "reasonable expectation that discovery will reveal evidence" standard).

It is reasonable to infer that, in refusing to either accept missing-persons reports or allow Simkova to post missing-person notices in Newark Penn Station, Garfield and Newark officers were following some form of municipal or department policy.[5]  And at oral argument, Simkova's

---

[5] It is less clear how the one incident that distinguishes the Newark and Garfield fact patterns— that Newark police misled Simkova about whether Michael was still alive, by reporting seeing him near the precinct—can be fairly inferred as the product of municipal custom or failure to train.  Since *Monell* liability cannot be predicated on *respondeat superior,* whether officers

App. Vol.I. 000018

lawyer told the Court that the purpose of raising Patricia's Law in the complaint was to show that standards existing *before* the implementation of Patricia's Law were inadequate.

"Inadequate," though, is not the same as "constitutionally deficient." If Garfield and Newark police-report policies were not in line with the desired policies of the state, such that the state felt the need to pass Patricia's Law, this has no bearing on whether the policies were so inadequate as to be constitutionally infirm. The declaration in Patricia's Law that henceforth no police department can refuse to take a missing persons report, *see* N.J.S.A. § 52:17B-213(a), can be seen as a bold, swift, and sure method of avoiding problems, particularly in the age of electronically stored information. It highlights how government may address unintended consequences such as happened here. At the same time, the policies of taking missing reports on a department by department basis are not revealed as *unconstitutional*, which is what Simkova needs for a due process claim. In fact, even if Garfield and Newark were to act the same way in 2014 as they acted in 2007, thereby violating the requirements of Patricia's Law, Simkova could not premise a § 1983 suit solely on the municipalities' failure to properly follow state law. *See McMullen v. Maple Shade Twp.*, 643 F.3d 96 (3d Cir. 2011) ("[B]y its terms, [42 U.S.C.] § 1983 provides a remedy for violations of federal, not state or local, law.").

Instead, to demonstrate constitutional infirmity requires "proof of a pattern of underlying constitutional violations," which is absent here. *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004). In *Bielevicz v. Dubinon*, 915 F.2d 845 (3d Cir. 1990), the Third Circuit emphasized that custom "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* at 850. Even if this Court stretched and assumed the existence of prior,

---

intentionally or mistakenly reported having seen Michael bears no relation to municipal liability under *Monell*.

App. Vol.I. 000019

inadequate policies, and accepted that they amounted to "custom," Simkova has not pleaded facts showing how those policies plausibly led to what happened. "Claims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof." *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 406 (1997). "Like a tort plaintiff, a § 1983 plaintiff must establish both causation in fact and proximate causation." *Lamont v. New Jersey*, 637 F.3d 177, 185 (3d Cir. 2011); *see also Barr v. Cnty. of Clarion*, 417 F. App'x 178, 181 (3d Cir. 2011) (nonprecedential) (discussing the concept of proximate cause).

Keeping in mind the absolute requirement of showing a constitutional deprivation, while it may be said that the municipal defendants' combined actions or inactions resulted in Michael's burial years before his mother knew about his death, Simkova's due process claims must demonstrate a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. *Carswell*, 381 F.3d at 244. Simkova's *Monell* claims rest on the following chain of events: Newark and Garfield refuse to take police reports, Newark refuses to let her leaflet, Michael's body remains unclaimed despite the identification, and he is buried months later in a mass grave. Even construing the facts in the light most favorable to Simkova, the link between policies in Newark and Garfield about how police reports on missing persons were taken and the events alleged is simply "too tenuous" to support a claim of liability. *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990); *see also Hodinka v. Del. County*, 759 F. Supp. 2d 603, 616 (E.D. Pa. 2010) ("This sort of attenuated causation logic would deprive *Monell* of any significance as a bar to municipal liability.").

Simkova also has not pleaded facts sufficient to suggest a culpable mental state or level of intent for either departmental individuals or the municipalities themselves. Negligence cannot

15

implicate a due process claim; only deliberate conduct will do. *Chambers v. Sch. Dist. of Phila.*

*Bd. of Educ.*, 587 F.3d 176, 191 (3d Cir. 2009). Showing the required state of mind in the

context of *Monell* requires demonstrating that the municipal action was taken with "deliberate

indifference as to its known or obvious consequences." *A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*,

372 F.3d 572, 580 (3d Cir. 2004) (internal quotation marks & citation omitted). Here, as argued

by the defendants, the pleaded facts show, at best, heightened negligence: errors in taking and

following up on missing persons reports. And as the Supreme Court pointed out in *Brown*, under

the deliberate indifference test, "[a] showing of simple or even heightened negligence will not

suffice." *Brown*, 520 U.S. at 407. Simkova cannot show a constitutional entitlement to a

particular missing persons reporting system.

The defendants also rely on *Thompson v. Robert Wood Johnson University Hospital*, No.

09-00926, 2011 WL 2446602 (D.N.J. June 15, 2011), in which Judge Pisano decided that claims

similar to the ones presented here did not survive summary judgment. In *Thompson*, the plaintiff

told the defendants that she did not want them to perform an autopsy on her baby, but an autopsy

was performed anyway. There was no indication in the record that the persons performing the

autopsy knew about the plaintiff's objections. Suit was filed based on several theories, including

due-process failure to supervise/train claims and deprivation of free exercise. *See Thompson*,

2011 WL 2446602, at *3. Judge Pisano found that there was no indication of willful conduct on

behalf of the defendants; "[w]ithout evidence showing more than negligence . . .[,] the Court

finds that no reasonable juror could find that [certain defendants] engaged in conduct sufficient

to establish a violation of Plaintiffs' due process rights under § 1983." *Thompson*, 2011 WL

2446602, at *7. With regard to a failure-to-train claim, and assuming the underlying property

interest discussed above, there was no evidence of a noxious policy sufficient to allow the

16

plaintiff to prevail on a *Monell* theory. *Id.* at *6. While decided under a different procedural posture, *Thompson* is similar enough to the case at bar to illustrate why Simkova has failed to state a claim upon which relief could be granted.

But the biggest impediment to Simkova's due process claims is that they seek to assign liability on the basis of the municipalities' *failure to assist* Simkova's search for her son. At its core, the constitutional deprivation she alleges is that the municipalities, using faulty policies, failed to act. Generally, "failures to act cannot form the basis of a valid § 1983 claim." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 433 n.11 (3d Cir. 2006). An exception to this rule, the "state-created danger" doctrine,[6] allows for failure-to-act liability when a plaintiff shows 1) foreseeable harm, 2) state action that shocks the conscience—it must *always* do so, *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006)—, 3) a state/plaintiff relationship creating foreseeable victimhood, and that 4) "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Ye v. United States*, 484 F.3d 634, 637–38 (3d Cir. 2007). This test no longer has a "third party" requirement in this Circuit. *Id.* at 637. The foreseeability showing in the context of the state-created danger doctrine is heightened; "[t]o adequately plead foreseeability . . . require[s] a plaintiff to allege an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 238 (3d Cir. 2008).

Simkova's due process claims fail the first and third prongs of the test. As discussed above, the link between the alleged policy, practice, or failure to train, and the harm resulting—

---

[6] Another exception, the "special relationship" test, requires a level of physical custody that is not present in this case. *See Ye v. United States*, 484 F.3d 634, 637 & n.1 (3d Cir. 2007) (construing Supreme Court case to require "a test of physical custody").

deprivation of her possession of Michael's body—is strained even under general principles of

causation, and cannot meet the heightened standard required for a state-created danger theory of

relief. Nor is there a particular relationship that speaks to foreseeable victimhood.

A case from the Sixth Circuit that the defendants rely on is instructive on this point. In

*Gazette v. City of Pontiac*, 41 F.3d 1061 (6th Cir. 1994), the plaintiff's mother had been

abducted. The plaintiff called the police department to report her missing. The police, knowing

the mother to be an alcoholic, refused to take a report and lied about having investigated the

scene. Later, the mother was found dead. The Sixth Circuit held that the underlying claim—that

the officers did not rescue the mother—did not give rise to a constitutional tort under § 1983.

*See id.* at 1065. The court then turned to the plaintiff's claims based on active misrepresentation:

because the police officers had told her they were investigating, nobody else did so. This claim

failed on causality, because there "is no close causal connection between the police officers' lies

and [the mother's] death because many factors could have prevented the police officers, or [the

mother's] family and friends, from locating [her]." *Id.* at 1066. Because "the Due Process

clause does not guarantee any citizen the right to government aid, including a guarantee of

rescue," this claim failed. *Id.* Finally, the police officers were at most grossly negligent, which

the Sixth Circuit held to be insufficient *scienter* under *Collins v. City of Harker Heights*, 503

U.S. 115 (1992). *Id.* at 1066–67.

*Gazette* is not on all fours with Simkova's claims, but the differences hurt her case rather

than help it. Under *Gazette*, if the police conduct had led to Michael's death—if, by refusing to

take a missing-persons report, refusing to let Simkova leaflet, and actually lying to her about

seeing him alive, the officers exacerbated the situation such that Michael died—neither the

police nor the municipality would be liable under the state-created danger test. *Gazette* stands

18

for the proposition that *more* egregious conduct than Simkova has alleged would not amount to constitutional liability. Further, the outcome of *Gazette* is in line with the law of the Circuit, which pairs constitutional liability with affirmative state action. *See Bright v. Westmoreland Cnty.*, 443 F.3d 276, 284 (3d Cir. 2006) ("Liability requires affirmative state action . . . ."); *see also Lombardi v. Whitman*, 485 F.3d 73, 80 n.4 (2d Cir. 2007) (construing the principle of *Bright* to be a rejection of "the argument that a citizen's reliance on an officer's promises could constitute a state created danger").

     Simkova argues that the state-created danger test is inapposite because she bases her claims not on the underlying failure to act, but rather on the policies or faulty training that led to the failure to act, which amount to affirmative municipal actions. On the facts of this case and the well-established law discussed above, this is a distinction without a difference. Courts have repeatedly held that, barring satisfaction of the state-created danger doctrine, a plaintiff cannot state a constitutional claim for failure to act. A plaintiff cannot evade these requirements by simply reframing a failure to act as an affirmative decision by the municipality, because municipal liability requires constitutional harm, *see Grazier v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003). The *Gazette* court came to essentially this conclusion, finding no underlying violation by the individual defendants and declining to reach the municipality's liability. *Gazette*, 41 F.3d at 1068.

     Finally, and as an example of the usefulness of oral argument, counsel for the Garfield defendants read aloud language from the Supreme Court's decision in *City of Canton v. Harris*, 489 U.S. 378 (1989), in which the Supreme Court explained why—in the context of failure-to-train *Monell* claims—the heightened "deliberate indifference" standard of fault and causation was necessary:

App. Vol.I. 000024

> In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. . . . Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell* . . . . It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism.

*Id.* at 392 (citations omitted). Simkova's due process claims, which target the municipalities and not individual employees, are based on what Garfield and Newark "could have done" to allow her to recover the body of her son: they could have been (and later were, via Patricia's Law) looped into better missing-persons procedures, or been more sympathetic to her desire to leaflet in Penn Station, or been more aggressive at seeking information from the Medical Examiner. Even were a clearer deprivation identifiable, it might still not suffice under *Canton* because the essence of the factfinder's activity would be second-guessing the wisdom behind municipal action, as opposed to basing its decision on abhorrence of the outcome. And in the absence of a clear causal deprivation of a right, whether constitutional or not, these allegations do not rise to the level of stating constitutional violations by the municipal defendants.

In sum, the Court is satisfied, after examining them from all angles, that Simkova's federal constitutional claims in counts one and two of the complaint must be dismissed.

### C) Free Exercise Claim under 42 U.S.C. § 1983

Count three alleges that all defendants violated Simkova's First Amendment right to bury her son in accordance with her religious beliefs, in violation of the free exercise clause. This claim fails for substantially the same reasons—causality, foreseeability, and so on—discussed above. But in addition, it is well established that laws or actions that do not target religious practice, but instead incidentally burden that practice, need not be justified by a compelling

20

government interest. *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531

(1993). Simkova cannot show that either the policies or individual activities challenged here

"selectively burden religiously motivated conduct." *Brown v. City of Pittsburgh*, 586 F.3d 263,

284 (3d Cir. 2009). In fact, she does not allege that the defendants were aware of, or acted in

response to, her religious concerns, or had any idea that their actions might affect her religious

practice. "[N]egligent acts by officials causing unintended denials of religious rights do not

violate the Free Exercise Clause . . .[; a plaintiff] must assert conscious or intentional

interference with his free exercise rights to state a valid claim under § 1983." *Lovelace v. Lee*,

472 F.3d 174, 201 (4th Cir. 2006); *see also Thompson*, 2011 WL 2446602, at *8 ("[W]ithout

evidence showing some motivation relating to [the plaintiff's] religion, the Court finds that [the

defendants] could not have engaged in conduct sufficient to establish a violation of her free

exercise clause rights."). In the absence of these allegations, or of a showing of compulsion or

coercion, Simkova's free exercise claim cannot survive a motion to dismiss. *See Anspach v. City

of Phila.*, 503 F.3d 256, 272–73 (3d Cir. 2007) (deciding, in absence of compulsion, coercion, or

the defendants' awareness, that a plaintiff's free exercise rights were not violated).

### D) Hua and Calderon, the Non-moving, Individual Defendants

A trial court may dismiss a complaint *sua sponte* under Fed. R. Civ. P. 12(b)(6) if the

pleadings evince a proper basis to do so, and so long as the affected parties are provided proper

notice and an opportunity to respond. *See Coulter v. Unknown Prob. Officer*, No. 13-3607, 2014

WL 998537, at *2 n.2 (3d Cir. Mar. 17, 2014) (nonprecedential per curiam) (affirming *sua

sponte* dismissal of non-moving defendants based on grounds raised by one defendant "but

common to all defendants, and to which [the plaintiff] had an opportunity to respond");

*Martinez-Rivera v. Ramos*, 498 F.3d 3, 7 (1st Cir. 2007) (allowing for *sua sponte* dismissals in

App. Vol.I. 000026

limited situations); *cf. Otis Elevator Co. v. George Wash. Hotel Corp.*, 27 F.3d 903, 910 (3d Cir. 1994) (applying the same test in the summary judgment context). Notice requires giving a party reason to believe that the court might reach the issue, so that it can put "its best foot forward." *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 223 (3d Cir. 2004) (internal quotation marks & citation omitted).

Neither Hua nor Calderon has made an appearance in this suit. Counsel for Simkova said at argument—and the docket currently reflects—that while Calderon was served [D.E. 48], Hua has not been. Nevertheless, the Court finds that the claims against Hua and Calderon should be dismissed for precisely the same reasons discussed above, and on the exact theories to which Simkova responded both during briefing and at argument.

First, to the extent that Hua and Calderon are sued in their official capacities, "[a] suit against a governmental official in his or her official capacity is treated as a suit against the governmental entity itself." *A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004). Because Hua and Calderon are employees of the Medical Examiner, and the Medical Examiner (in both State and Regional forms) is protected by Eleventh Amendment immunity, then the official-capacity claims must also be barred under the Eleventh Amendment. *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 (3d Cir. 2010) ("Individual state employees sued in their official capacity are also entitled to Eleventh Amendment immunity . . . .").

Second, the only count naming Hua and Calderon as individual defendants to a federal claim is count three, the free exercise claim. As discussed above, free exercise claims rely on knowledge, compulsion, and coercion. Simkova alleges nothing of the sort with regard to either Hua and Calderon; in fact, Calderon's only involvement in this dispute is her interaction with Simkova at the Northern Regional office during the positive identification of Michael from a

22

photograph. Accordingly, the claims against Hua and Calderon in their individual capacities must fail.

### E) Eternity Funeral Services

The same reasoning applies to compel the dismissal of Eternity, which has answered the complaint [D.E. 33] but did not move to dismiss. Assuming without deciding that Eternity is a state actor such that § 1983 liability can apply, and that Simkova's *Monell* theory can also apply against Eternity (per grounds one and two), the free exercise and due process claims fail for the same reasons already discussed above.

### F) State-Law Claims

Simkova's state constitutional claims (in counts one and two) and statutory/common-law claims (in count four) remain. As the Court has already dismissed all claims over which it could exercise federal question jurisdiction, the Court declines to exercise jurisdiction over the state-law claims and dismisses them without prejudice. *See* 28 U.S.C. § 1367(c)(3); *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000).

### IV. Conclusion

Simkova's federal claims are dismissed in full under Fed. R. Civ. P. 12(b)(6) and the Court declines to exercise jurisdiction over the state law claims. An appropriate order will be entered.

March 31, 2014

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

23

App. Vol.I. 000028

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that, on this date, this Appendix was filed electronically through the Third Circuit's CM/ECF system and served via CM/ECF system, and seven copies were mailed to:

Office of the Clerk

United States Court of Appeals for the Third Circuit

21400 United States Courthouse

601 Market Street

Philadelphia, PA 19106-1790

In addition, one copy was served by U.S. Mail, on the following counsel of record:

Mr. Anthony Pasquarelli, Esq. (tonyp.inslaw@verizon.net)

17A Joyce Kilmer Avenue North,

P.O Box 674

New Brunswick, New Jersey 08903


Mr. Gary Lipshutz, Esq. (lipshutzg@ci.newark.nj.us)

Assistant Corporation Counsel

920 Broad Street,

Newark, New Jersey 07102


Mr. Robert Murphy, Esq. (robert.murphy@lps.state.nj.us)

Deputy Attorney General

25 Market Street,

P.O. Box 116

Trenton, New Jersey 08625-0116


Mr. Joseph Defuria, Esq. (jdefuria@gpmlegal.com)

524 Union Avenue, P.O. Box 96

Belleville, New Jersey 07109

Dated: Newark, New Jersey, July 22, 2014.

_Peter Briskin_ _____

Peter E. Briskin, Esq.

*Counsel for Plaintiff/Appellant*
